**STATE**

v.

**Joseph A. DiMUCCIO.**

**No. 79–493–C.A.**

Supreme Court of Rhode Island.

July 2, 1981.

---

Dennis J. Roberts, II, Atty. Gen., Joel S. Chase, Sp. Asst. Atty. Gen., for plaintiff.

Giovanni Folcarelli, Joseph J. Rodio, Providence, for defendant.

## OPINION

SHEA, Justice.

The defendant, Joseph A. DiMuccio (DiMuccio), was convicted by a jury in the Superior Court pursuant to count 1 of a two-count criminal information charging that he did break and enter the service building of the State of Rhode Island and Providence Plantations, Institution of Mental Health (IMH), in the nighttime with intent to commit larceny therein, in violation of G.L. 1956 (1969 Reenactment) § 11–8–4. A motion for a judgment of acquittal was granted in regard to count 2 of the information charging the defendant with dereliction of duty. After conviction, the trial justice sentenced the defendant to five years at the Adult Correctional Institutions, with four years suspended and four years' probation.

On appeal defendant makes the following assignments of error: (1) that the trial justice erred in denying defendant's motion for judgment of acquittal on count 1 of the criminal information, and (2) that the trial justice improperly charged the jury with respect to the reasonable inferences that they might draw.

On May 27, 1979, DiMuccio was working the 4 p. m. to midnight shift as a public properties patrolman at the IMH. Also working on the same shift were two other patrolmen, William J. McCarthy and Albert H. Aurelio. At approximately 11 p. m., Dr. Constantine Loures, a physician and clinical director at the IMH who lives in an apartment on the grounds of the Medical Center, saw from his second-floor window, a car with no lights on and with the trunk and door open, backed up to a hallway leading to the cafeteria at the rear of the building. Becoming suspicious, as he later testified, Dr. Loures called the security police located on the first floor in the same building, and told Patrolman McCarthy, the desk officer, what he had just seen. After the call, Dr. Loures went back to the window where he saw a man, whom he could not identify, place an object that he had been carrying with both hands into the trunk of the car Dr. Loures had reported. He then saw the car, with its lights off, drive over the lawn, and proceed all the way around to the front of the building where the driver parked the car near the security office.

Meanwhile, Patrolman McCarthy called Patrolman Aurelio and told him to check

out the rear entrance to the cafeteria. He then locked the security office and went to meet Patrolman Aurelio. The two patrolmen entered the cafeteria from the rear and observed that a storeroom, which was located off the cafeteria and which was normally double locked with a skeleton key and a padlock, was unlocked and the padlock was missing. At this point the two patrolmen were joined by defendant who said that he had gone to the security office, found it locked, and assumed that they would be close by. Not finding anyone in the area, the patrolmen returned to the office where McCarthy called Dr. Loures, who immediately came downstairs and went to the front of the building with the three officers. He pointed to the car he had seen from his window. After this identification, defendant later testified that he had said to Dr. Loures, "That is my car that you saw and me."

After Dr. Loures left the company of the three officers to return to his apartment, Patrolman McCarthy asked defendant if he could look in the trunk. Nothing was found there, but Patrolman McCarthy later testified that he saw a large Hobart meat slicing machine, designed for commercial use, in the back seat of the car.[1] At this point, Patrolman McCarthy testified that defendant made self-incriminating statements in an attempt to get Patrolman McCarthy to forget the whole matter. Not persuaded, Patrolman McCarthy told Patrolman Aurelio and defendant to put the meat slicer back into the storeroom. He then reported the incident to his superior, who subsequently notified the State Police.

■ The defendant initially contends that the trial justice erred in denying his motion for judgment of acquittal regarding count 1 of the criminal information because the evidence was insufficient to establish guilt beyond a reasonable doubt. When deciding such a motion, the trial justice must first examine the evidence that the state claims is the necessary foundation for submitting the case to the jury, and then evaluate it in a light most favorable to the state, drawing all reasonable inferences consistent with guilt. While performing this function, the trial justice does not assess either the weight of the evidence or the credibility of the witnesses. *State v. Jefferson*, 116 R.I. 124, 128–29, 353 A.2d 190, 193–94 (1976); *State v. Wilbur*, 115 R.I. 7, 15–16, 339 A.2d 730, 735 (1975). The sole purpose of this evaluation is to test the sufficiency of the evidence adduced at the trial by the state. *State v. Lisi*, 105 R.I. 516, 519, 253 A.2d 239, 241–42 (1969).

■ In this case, a denial of the motion and the submission of the case to the jury would be proper when the state produced sufficient evidence as to each and every element of the crime to justify a finding of guilt beyond a reasonable doubt by the jury, since the state has the burden of proof of each and every element of the crime. *In re Victor A. Pereira*, 111 R.I. 712, 714, 306 A.2d 821, 823 (1973); *State v. Koohy*, 105 R.I. 197, 201, 250 A.2d 711, 714 (1969). There are four elements that must be proven beyond a reasonable doubt before a conviction can lie pursuant to § 11–8–4. They are a break, entry, nighttime, and the intent to commit larceny.

The defendant attacks the sufficiency of the evidence by claiming that there was no evidence to show that he did not have the right to get the key to the padlock on the storeroom door through his normal routine, and go into the storeroom. The thrust of this argument is that if defendant had the right to enter the storeroom in his normal routine, then there could have been no unlawful break or entry. Similarly, defendant argues that if the property comes into his possession by virtue of his employment, his conduct is embezzlement and not larceny. The defendant's remaining evidentiary contention is that there was insufficient

---

1. There is nothing in the record which clarifies the inconsistency in the testimony concerning Dr. Loures' statement that he saw a man place something into the trunk of the car whereas Patrolman McCarthy testified that he found the meat slicer in the back seat of the car. Such inconsistencies are for the trier of fact to resolve. *Russian v. Lipet*, 103 R.I. 461, 238 A.2d 369 (1968).

evidence for the jury to conclude that the break and entry occurred in the nighttime. In our opinion these contentions have no merit.

Determining whether or not defendant had the right to get the key to the padlock and enter the storeroom as part of his employment is a question of fact. The record indicates that defendant's duties involved checking buildings and all doors to make sure they were locked and secured. The senior cook, Joseph Martin, testified that at 6:20 p. m. on May 27, 1979, he had locked the meat slicer inside the storeroom off the kitchen by means of a skeleton key and a padlock. He further testified that almost anyone who had anything to do with the building had a key to the skeleton lock, but that there were only two keys to the padlock. In regard to the key that he had used to lock the storeroom, Martin testified that he dropped it through a hole in the wall leading to a locked office.[2] He also stated that the only people who had keys to the office[3] were the senior cook on the first shift, the principal cook on the first shift, and Mr. Thomas Reilly.[4] In regard to the second key that opens the padlock on the storeroom door, Martin testified that it is kept on a ring in a cupboard in the same locked office.

We feel that it is reasonable to infer from the above testimony adduced by the state that defendant was not authorized to enter the storeroom where the meat slicer was kept as part of his duties as a patrolman. Without authority to enter the storeroom, defendant is likewise without authority to have the meat slicer in his possession as part of his official duties. Thus, defendant's claim that his conduct is, if anything, embezzlement and not larceny is without

merit. This court has said that the basic distinction between embezzlement and larceny is that in embezzlement, the property comes lawfully into the possession of the offender, whereas in larceny the offender takes it unlawfully in the first instance. *State v. Crescenzo*, 114 R.I. 242, 250, 332 A.2d 421, 427 (1975).[5] This defendant never had a right of possession of the meat slicer.

Partially on the basis of the same testimony as above, defendant's claim that there could be no break or entry must fail. The evidence, when viewed most favorably to the state, showed that the storeroom was double locked on the night of May 27, 1979, that defendant did not have access to the key to enter the storeroom, that Patrolmen McCarthy and Aurelio found the storeroom door unlocked with the padlock missing, and that the meat slicer was later seen in the back seat of defendant's wife's car on the grounds of the Medical Center. Drawing all reasonable inferences consistent with guilt, there was sufficient evidence for the trial justice to allow the jury to determine whether or not the defendant did break and enter.

The final alleged error in the trial justice's denial of the motion for judgment of acquittal is that there was insufficient evidence from which the jury could find that the break and entry occurred in the nighttime. The defendant contends that even though Dr. Loures testified that he saw a man placing an object into a car, later found to be the car defendant had driven to work, at approximately 11 p. m. which obviously is the nighttime, there was no evidence indicating that the actual break and entry occurred in the nighttime. When Joseph Martin locked the meat slicer in the storeroom at 6:20 p. m. there was still light

---

**2.** The key he used to lock the padlock was one of many on a key ring that was dropped through the hole in the wall leading to the office. He further testified that the office is locked at either 1:30 or 2:30 p. m.

**3.** The office referred to is where the principal cook works and is located off the main kitchen.

**4.** Mr. Reilly is the food administrator at the IMH.

**5.** The facts recited above are those from which it can most strongly be inferred that defendant did not have lawful possession of the meat slicer by virtue of his employment. We do not mean to imply, however, that the question of lawful possession in this type of case turns solely on the question of access to the property.

out. The inference that defendant committed the break and entry in the nighttime based on the direct evidence that the meat slicer was placed in the car at about 11 p. m. is a reasonable one and one that the jury could properly draw. This court has described an inference as a deduction based on either direct or circumstantial evidence. *State v. Koohy*, 105 R.I. at 202, 250 A.2d at 714. Here the logical deduction is that since defendant was seen with the slicer outside the cafeteria at 11 p. m., he actually removed it from the storeroom reasonably close in time to his being seen. The trial justice properly denied the motion for judgment of acquittal.

■ The final issue raised by defendant in this appeal is whether the trial justice committed reversible error when he charged the jury concerning reasonable inferences that the jurors may draw from the testimony adduced at trial. Specifically, defendant claims that the reasonable-inference charge was highly prejudicial to this case, and may have encouraged the jury to draw an unreasonable inference.[6]

After reviewing the charge, we conclude that it is a proper example of the drawing of a reasonable inference from established facts. The defendant is really arguing that the trial justice's otherwise proper instruction on reasonable inferences could have led the jury to believe that, because the defendant had the meat slicer in his possession, a

reasonable inference could be drawn that he had stolen the slicer. Thus, defendant contends that the intent-to-commit-larceny element of the crime was shown on the basis of an unreasonable inference.

This contention is not valid. It is clear from the record that there was sufficient evidence for the judge to submit the question of defendant's intent to commit larceny to the jury and for the jury to find that such intent existed beyond a reasonable doubt. Evidence of intent to commit larceny, in addition to his possession of the meat slicer, included statements made by defendant when his fellow patrolmen learned that he had possession of the slicer. Patrolman McCarthy, the desk officer for the security police at the Medical Center during the evening of May 27, testified that when he saw the meat slicer in the car, he said to defendant, "Joe, we have got a problem here," to which defendant responded, "Not necessarily. I can put it back where I got it. We can forget the whole thing." Patrolman McCarthy also testified that defendant asked McCarthy to give him a break, and told him that he had never done anything like this before and that he needed money. Although defendant later denied making these statements, and in fact claimed that he had found the meat slicer on a stairwell and put it into his wife's car to keep someone else from stealing it, the jury had the right to believe Patrolman

**6.** The challenged portion of the jury charge is as follows:

"For example, let's assume that you were to go downstairs just before going to bed some night, and into the milk box on your front porch you put three empty milk bottles. You return into the house. You go to bed. You have a nice sound sleep. The following morning you awake, you go downstairs to the milk box, you open it up, you take from it three filled milk bottles. You then take them into the house and eventually into the kitchen, and then start putting them in the refrigerator. Now, if at that moment someone were to walk into your kitchen and say, Mom, Dad, sister or brother, 'Did the milkman come last night?' Well, now let's stop right there and think about that. Do you have any direct evidence upon which you can base your answer? Absolutely not. You were fast asleep. Do you then respond to the

individual who asked the question, 'I am sorry, I can't give you an answer to that question, because I have no direct evidence upon which I can base my answer.' Of course not. They would think you weren't all there, so to speak. What do you do? You simply respond automatically, mechanically, 'Yes the milkman came last night.' How did you do it? Just think about it for a second. You had Fact A, you put out the empty milk bottles. You had Fact B, they were filled in the morning, and you were asked to conclude Fact C upon which you had no direct evidence, and you did conclude that Fact C took place. You drew a reasonable inference from established facts. That is all that circumstantial evidence is all about and that is what it means. So, in reviewing all of the evidence in this case you have a right to draw reasonable inferences from that evidence."

McCarthy and to disbelieve defendant's testimony.

We find no flaw in the trial justice's instructions to the jury on reasonable inferences. Also, he properly denied the defendant's motion for judgment of acquittal.

The appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers of this case are remanded to the Superior Court.