**STATE**

v.

**Gloria Z. AHMADJIAN, David Carlin, Jerry Pugh.**

Nos. 77–129–C.A., 77–70–C.A., 77–69–C.A.

Supreme Court of Rhode Island.

Dec. 24, 1981.

Dennis J. Roberts, II, Atty. Gen., Kathryn A. Salmanson, Sp. Asst. Atty. Gen., for plaintiff.

John J. Bevilacqua, Providence, for defendants.

## OPINION

SHEA, Justice.

In this case we consider the consolidated appeals of three defendants convicted by Superior Court jury of conspiracy and of various drug law violations.[1]

Jerry Pugh (Pugh) was convicted of conspiring to traffic in controlled substances, stolen firearms and explosives, and to enforce payments through extortion. Pugh was sentenced to five years with thirty months suspended, and five years' probation.

David Carlin (Carlin) was convicted of the same conspiracy charge as Pugh. Additionally, Carlin was convicted of unlawful possession of opium, unlawful sale of opium to James O'Connell, and unlawful delivery of hashish to James O'Connell. Carlin received a ten-year suspended sentence, a two-year sentence with a $1,000 fine, and two five-year sentences with three years suspended for each charge, respectively, two years to serve for each. All sentences were to run concurrently.

Gloria Z. Ahmadjian (Ahmadjian) was convicted of the same conspiracy charge as defendants Pugh and Carlin. Additionally, Ahmadjian was convicted of unlawful sale of marijuana to David Ormiston. Ahmadjian received a ten-year suspended sentence with four years probation, and a four-year sentence, respectively.

The defendants have raised several issues for our consideration. Initially, all three defendants contend that they were deprived

of their right to confrontation guaranteed by the Sixth Amendment to the United States Constitution, and art. I, sec. 10, of the Rhode Island Constitution; defendants Pugh and Carlin claim that the trial justice erred in denying their motion to suppress tapes that were the product of participant monitoring; Pugh and Carlin claim that the trial justice erred in not suppressing the tapes that were the product of a wiretap on codefendant James E. O'Connell's telephone; Pugh and Carlin contend that the trial justice erred in denying their motions for judgment of acquittal and new trial based on alleged insufficiencies in the evidence to sustain a conspiracy conviction. Pugh and Carlin also claim that the trial justice gave erroneous instructions to the jury.

Pugh individually contends that he was denied his right of cross-examination by not being allowed to inquire into the alleged use of drugs at certain times by the state's principal witness. Pugh also argues that he was indicted by an unconstitutionally constituted grand jury. Finally, Carlin contends that he cannot be convicted for possession of a controlled substance when he has also been convicted of delivery of the same substance.

We shall consider each of these issues after first reviewing the facts. The evidence in this case came largely from the testimony of the state's principal witness, David E. Ormiston (Ormiston). An unindicted coconspirator, he testified at length regarding a large-scale drug, weapons and extortion conspiracy in which he had become involved. He identified the ringleaders of this conspiracy as James E. O'Connell and, to a lesser extent, Ahmadjian whom he had first met socially in November 1974. According to Ormiston, he met socially with O'Connell and Ahmadjian approximately fifteen times between November, 1974 and January 8, 1975. During one five-day period they stayed at his apartment. He testi-

---

1. An appeal by a fourth defendant, James E. O'Connell, had also been consolidated with the appeals that are the subject of this opinion. Defendant O'Connell has not pursued his ap-

pellate remedies. At oral argument his attorney requested that his case be passed. No brief was filed on his behalf.

fied that he did not become aware of the existence of Whitebird Corporation (Whitebird), a corporation established to effectuate the illegal designs of the conspiracy, until January 8. Ormiston claimed it was not until that date that he became aware that O'Connell and Ahmadjian were involved in the trafficking of drugs and other commodities, and that Whitebird was incorporated to "launder" illegally obtained money.

O'Connell's reason for telling Ormiston about the illegal activities was that O'Connell wished to bring Ormiston into the corporation as a "vice president." The president of the Whitebird Corporation at the time was O'Connell. Ormiston said he was chosen for vice president because he was told that he possessed the necessary criteria to be a Whitebird executive, that is, "no criminal record; [he] would not attract attention; he was respected in the community; he was dependable—not flaky."

Approximately one week after Ormiston had been asked to join Whitebird, he contacted a friend in the State Police, Trooper Gordon Allison (Allison), and told him about his situation. Allison did not contact his superiors immediately because he said he had no proof to substantiate Ormiston's story. On February 22, 1975, Ormiston gave Allison a small quantity of opium which he said was given to him by O'Connell. Three days later, Ormiston and Allison met with Sergeant Sullivan and Detectives Osediacz and Reali of the State Police and turned the opium over to them. From this point on, Ormiston became an informant for the State Police as they investigated the Whitebird conspiracy. His activities and telephone conversations were monitored with his knowledge and consent. He was instructed by the State Police to obtain samples of any narcotic substances available. Ormiston's role as an informant continued until May 14, 1975, when a grand jury handed down indictments against twenty-nine alleged conspirators, including the three defendants.

Regarding defendant Pugh, Ormiston said that they first met on February 6, 1975, at O'Connell's home. At this meeting, Ormiston, O'Connell, and Pugh discussed a prospective marijuana deal and the possibility of Pugh obtaining weapons from a friend of his in the Boston area. A subsequent meeting on the proposed marijuana sale was held on February 26. Next, on April 30, Ormiston and O'Connell went to Pugh's apartment in Brighton, Massachusetts, for the purpose of picking up 200,000 amphetamine tablets. Ormiston and O'Connell left with the tablets, and Ormiston eventually delivered a sample of the tablets to the State Police.[2]

Ormiston testified that on February 27, 1975, defendant Carlin came to O'Connell's house and met with O'Connell and him. In the rear bedroom of the house, in Ormiston's presence, Carlin paid O'Connell $1,200 for a drug-related debt and told O'Connell that he had access to more opium if there was a market for it. Ormiston assured Carlin that there was such a market. Carlin left the house and returned within a short time with three more ounces of opium. A sample of the opium was turned over to the State Police by Ormiston.

Next, on May 8, 1975, Carlin once again went to O'Connell's house and met with O'Connell, Ahmadjian, and Ormiston. This time, according to Ormiston, Carlin handed O'Connell two ounces of hashish which were passed to Ahmadjian for inspection and then back to O'Connell. O'Connell then gave Carlin a sum of money. Ormiston procured two grams of the substance from O'Connell and later turned it over to the State Police.

David Ormiston's testimony was crucial to the prosecution in presenting its case. Ormiston had initially made the State Police aware of the existence of the conspiracy, he allowed his conversations with defendants to be monitored, he obtained numerous samples of illegal narcotics, and through his testimony he tied together the various strands of the conspiracy. Under

---

**2.** Upon later examination of the tablets, it was learned that they were not amphetamines. Instead, they were merely a mixture of caffeine and ephedrine.

cross-examination by defense counsel, however, there came a time when Ormiston invoked the Fifth Amendment. He refused to answer any questions concerning his own involvement in the illegal conspiracy from the time when he first met O'Connell and Ahmadjian in November 1974 to the time when he became an informant for the State Police near the end of February 1975. The trial justice sustained each objection to such questions and accepted each of Ormiston's invocations of the privilege against self-incrimination.

## I

The defendants argue that exposing any participation by Ormiston in the conspiracy prior to his role as an informant would enable them to show bias on his part. It is their position that Ormiston was so deeply involved in the Whitebird conspiracy that he would fabricate testimony implicating others in order to exonerate himself. Their inability to cross-examine Ormiston on this point is the basis of their contention that as defendants they were deprived of their right to confrontation. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

Let us consider first the propriety of Ormiston's claim of the privilege against self-incrimination *and then whether he waived the privilege by testifying on direct.*

■ When Ormiston was asked on cross-examination about his own involvement in the Whitebird conspiracy, he could properly refuse to answer if such answer would incriminate him. *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). The trial justice made no inquiry into Ormiston's reasons for invoking the privilege. Such inquiry was unnecessary in this case because it was evident from the nature of the questions that an answer would probably be incriminating. The questions asked Ormiston directly whether or not he participated in any illegal activities prior to his becoming an informant.[3]

■ Once it is clear from the implications of the question in the setting in which it is asked that a responsive answer to the question or an explanation why it cannot be answered might be dangerous because an injurious disclosure could result, it is "the duty of the court to refrain from placing upon the witness the burden of establishing the incriminatory nature of responses to the question by making disclosures that in themselves would be incriminatory." *State v. Hasney,* 115 R.I. 210, 213, 341 A.2d 729, 731 (1975).

■ We conclude also that Ormiston did not waive his Fifth Amendment privilege when he testified on direct examination. To effect a waiver, he would have had to relinquish or abandon the privilege intentionally, *Hummell v. Superior Court,* 100 R.I. 54, 58, 211 A.2d 272, 274 (1965), or he would have to have given self-incriminating testimony on direct examination without claiming his privilege, thereby making himself subject to cross-examination on all matters raised by or relevant to that testimony. *Brown v. United States,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). Ormiston *did not give self-incriminating testimony on direct examination.* Instead, he claimed that he had had only social ties with defendants prior to his becoming an informant and that thereafter he acted only under the direction of the State Police. Ormiston did not waive his privilege either directly or indirectly.

\* \* \* \* \* \*

Q. Let me just ask you, Mr. Ormiston, no matter how many times I ask you about those time periods you are going to invoke the Fifth Amendment?

\* \* \* \* \* \*

A. That is correct, sir."

---

**3.** "Q. Between February—strike that, January 8th and February 22nd when you spoke to Sgt. Sullivan or February 26th, but after you had been offered this employment opportunity by Mr. O'Connell did you do anything in connection with the activities of Whitebird?
A. I think I would have to respectfully refuse to answer that question on the grounds it might incriminate me, sir.

Once it became clear that defendants were not going to be able to cross-examine Ormiston about his own activities in the conspiracy prior to becoming an informant, they should have moved that his direct testimony be stricken. The record indicates that no such motion was ever made. Their failure to move to strike Ormiston's testimony was a decision on their part not to take advantage of the long-observed practice in this state of eliminating from the record testimony that is improper, erroneous, or prejudicial by means of a motion to strike. *State v. Dettore*, 104 R.I. 535, 247 A.2d 87 (1968); *State v. Rooks*, 62 R.I. 251, 4 A.2d 905 (1939); *State v. Amaral*, 47 R.I. 245, 132 A. 547 (1926).

We next consider whether or not the defendants' failure to comply with this procedural rule, the motion to strike, can foreclose review of an alleged constitutional deprivation, the right of cross-examination. In *Fay v. Noia*, 372 U.S. 391, 438–39, 83 S.Ct. 822, 848–49, 9 L.Ed.2d 837, 868–69 (1963), the United States Supreme Court held that a criminal defendant's failure to comply with a state procedural requirement would not preclude an examination of his constitutional claims in a federal habeas corpus proceeding, unless the noncompliance resulted from a deliberate bypass for strategic or other tactical reasons. Later, in *Henry v. Mississippi*, 379 U.S. 443, 448, 85 S.Ct. 564, 567–68, 13 L.Ed.2d 408, 413 (1965), the Court stated that a litigant's procedural defaults in state proceedings do not prevent vindication of constitutional rights unless a legitimate state interest is served by the procedural rule. The Court said:

> "The Mississippi rule requiring contemporaneous objection to the introduction of illegal evidence clearly does serve a legitimate state interest. By immediately apprising the trial judge of the objection, counsel gives the court the opportunity to conduct the trial without using the tainted evidence. If the objection is well taken the fruits of the illegal search may be excluded from jury consideration, and a reversal and new trial avoided." *Id.*

*Fay v. Noia* has been limited by subsequent Supreme Court decisions. *See Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). Following that line of cases, this court has held that appellate review should be available if the failure to comply with the procedural requirement is not a "deliberate bypass," if it does not constitute "sandbagging" by a defense lawyer, and if the record discloses that the error is not harmless. *State v. McGehearty*, R.I., 394 A.2d 1348, 1352 (1978). And as the Supreme Court has had occasion to refine its holding in *Fay v. Noia*, in later cases, this court has done likewise with *McGehearty*. In *State v. Pope*, R.I., 414 A.2d 781 (1980), this court, commenting on *McGehearty* said:

> "We permitted [in *McGehearty*] the defendant to raise the constitutional issue for the first time on appeal and, in doing so, might have left the bar with the impression that we had jettisoned our well-established rules which require the raising of a constitutional issue in the first instance at the trial level and which preclude a challenge to the sufficiency of the charge when a defendant has failed to object to the instruction or to request a different one. Nothing could have been further from our minds." *Id.* at 786.

We believe the situation in the case before us is the same as that in *Pope*. Nothing in this record necessitates a departure from our long-standing rule requiring motions to strike improper testimony. *State v. Dettore, supra*. This was not an issue of constitutional law unknown to defense counsel at trial. *Davis v. Alaska, supra*, decided in 1973, well before this trial, held that the inability of a defendant to cross-examine an adverse witness for bias because of the confidentiality of the witness's juvenile records violated his Sixth Amendment right to confrontation. Here, when defense counsel objected to Ormiston's claim of privilege, he gave as grounds for the objection that he was entitled to show that the witness had an interest in the

outcome of the case. The mere objection to Ormiston's claim of privilege was not sufficient to preserve the confrontation issue for appeal. As we have stated, Ormiston properly claimed his privilege, the trial justice was correct in overruling defendants' objection. At that point, because of this valid claim of privilege, defendants were faced with a situation in which they were unable to cross-examine Ormiston on his own involvement in the conspiracy before he became an informant. It was their obligation to raise the issue of the alleged inadequacy of the cross-examination by moving that his testimony be stricken from the record. The trial justice was not under any obligation to strike Ormiston's testimony on his own.

In keeping with the holding in *Henry v. Mississippi*, we believe that a legitimate state interest is served by requiring counsel to move to strike improper or prejudicial testimony. By making that motion, counsel informs the trial justice of the potential constitutional problems, and affords him the opportunity to "conduct the trial without using the tainted evidence." We hold, therefore, that the confrontation issue was waived by defendants at trial, and thus we shall not address it on appeal.

 The defendants next contend that the trial justice erred in denying their motion that he grant immunity to the witness once Ormiston invoked his privilege. The grant of immunity would have forced Ormiston to answer their questions.

The granting of immunity to a witness is governed by G.L. 1956 (1969 Reenactment) § 12–17–15, as enacted by P.L. 1969, ch. 54, § 1, which provides, in part:

"In any criminal proceeding * * * if a person refuses to answer a question or produce other evidence of any kind on the ground that he may be incriminated thereby, and if the attorney general, in writing, requests the presiding justice of the superior court to order that person to answer the question or produce the evidence, the said court, in it discretion after notice to the witness may order the person to answer the question or produce the evidence."

It is clear from its language that this statute applies only to situations in which the Attorney General seeks testimony from a witness who has claimed the privilege. In this case, this statute could have come into play if defendants had moved to strike Ormiston's testimony and the trial justice had granted the motion, assuming he found that there were grounds for it. Then the Attorney General would have been faced with the choice of losing Ormiston's testimony or requesting that the presiding justice grant him immunity. If immunized, Ormiston then would have been available to defendants for a full cross-examination. The defendants never brought this about.

There is no provision in our law authorizing a defendant to seek immunity for a prosecution witness or for a trial justice to grant such a request. The defendants argue that the trial justice had inherent power to immunize Ormiston and that his failure to exercise it constitutes reversible error. In *State v. Hasney*, 115 R.I. at 216, 341 A.2d at 732, this court left open the question of whether the trial court has inherent power, in a proper case, to immunize a witness from the use of compelled testimony. In this case we do not reach the question either. Although there are factual situations in which a trial justice might compel incriminatory testimony and the witness would then have a right to claim immunity, that is not the situation before us.

 In the case before us we hold that the request to have Ormiston immunized is one that the trial justice had no authority to grant. Under our law defendants are without standing either to challenge grants of immunity or to seek immunity for a prosecution witness. In *United States v. Davis*, 623 F.2d 188 (1st Cir. 1980), the First Circuit Court of Appeals held that a Federal District Court has no power to grant immunity to a witness whose testimony a defendant may wish to offer and that the government cannot be forced to grant such immunity. *Id.* at 192. That holding was based on the Federal Immunity Statute 18 U.S.C.A. §§ 6002–03 (1970), which not un-

like our own, places the power to apply for immunity with the United States Attorney and his superior officers. *Id.* The Court of Appeals, citing *United States v. Alessio*, 528 F.2d 1079 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184, *reh. denied*, 429 U.S. 873, 97 S.Ct. 193, 50 L.Ed.2d 156 (1976), where the government had obtained immunity for one prosecution witness and refused to use its authority to obtain immunity for witnesses on behalf of the defendant, stated:

"To interpret the Fifth and Sixth Amendments as conferring on the defendant the power to demand immunity for co-defendants, potential co-defendants, or others whom the Government might in its discretion wish to prosecute would unacceptably alter the historic role of the Executive Branch in criminal prosecutions. Of course, whatever power the government possesses may not be exercised in a manner which denies the defendant the due process guaranteed by the Fifth Amendment. * * * The key question, then, is whether appellant was denied a fair trial because of the Government's refusal to seek immunity for defense witnesses." *United States v. Davis*, 623 F.2d at 193.

The case before us and *Alessio* are different. In the cited case the defendant sought to have one of his witnesses immunized, and in this case, defendants sought to have the prosecution's witness immunized. The principle, however, is the same. We find that defendants' due-process rights and rights to a fair trial were not prejudiced by the trial justice's refusal to immunize Ormiston since defendants clearly had the right to move to strike his testimony, which they failed to do.

The defendants failed to bring the issue of right of confrontation squarely before the trial justice in any posture in which he had authority to grant relief. Therefore, they are in no position now, on appeal, to ask for or receive relief on that issue.

## II

■ The issues discussed in this part were raised by Pugh and Carlin and deal with various aspects of the wiretap evidence offered at trial. Pugh and Carlin contend that the trial justice erred in denying a motion to suppress tapes and transcripts of conversations which were the product of wiretaps and electronic surveillance. These recordings were made with the consent of Ormiston, a participant in each of the conversations. During their investigation of the Whitebird activities, the State Police monitored conversations between Ormiston and Pugh and between Ormiston and Carlin with Ormiston's consent but without prior court authorization. These defendants now claim that the procedure followed by the State Police violated G.L. 1956 (1969 Reenactment) chapter 5.1 of title 12 which provides the procedures to be followed when law enforcement officials intercept wire or oral conversations.

Section 12–5.1–2 requires the Attorney General to apply to the presiding justice of the Superior Court for an order authorizing the interception of any wire or oral communication. Concerning the disclosure or use of intercepted communications, § 12–5.1–10(c) provides:

"Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any criminal proceeding."

The defendants read § 12–5.1–10(c) to mandate compliance with the procedural requirements of this chapter before any intercepted wire or oral communication can be admissible in a criminal proceeding. Also they argue that because this chapter does not contain an exception from its provisions for the type of monitoring that was done in this case, participant monitoring, the admission of the tapes and transcripts without a prior court order was illegal.

In support of this theory, defendants cite *State v. Ricci*, 107 R.I. 582, 268 A.2d 692

(1970). In *Ricci* this court established broad guidelines regarding the scope of the tangible-evidence statute, § 12–17–16. At one point, the court concluded that § 12–17–16 had no application to recordings of intercepted wire and oral communications.

"[T]he legislature clearly intended, in enacting § 12–5.1–10, to establish the precise circumstances under which intercepted oral or wire communications may be disclosed and that such communications or documents containing transcriptions or recordations thereof are not within the scope of § 12–17–16." Id. at 591, 268 A.2d at 697.

The defendants read this language to mean that only communications obtained pursuant to chapter 5.1 can be admissible in a criminal proceeding. We reject that proposition. We hold that participant monitoring is not governed by the requirements of chapter 5.1. The State Police were not obliged to obtain a court order before monitoring Ormiston's conversations with Pugh and Carlin when Ormiston had already consented. We believe that the legislative intent in enacting chapter 5.1 was to provide procedural safeguards for individuals in situations in which law enforcement officials desire to intercept wire or oral communications without the knowledge or the consent of *any* of the parties. In situations where an individual consents to having his communications monitored, G.L. 1956 (1969 Reenactment) § 11–35–21(c)(2), as assigned, P.L. 1969, ch. 55, § 3 applies. This section provides:

"It shall not be unlawful under this chapter for: * * * A person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication, or where one of the parties to the communication has given prior consent to such interception * * *."

 The defendants correctly point out that this section does not provide for the admission of such communications in a

criminal proceeding. Such a provision is unnecessary. Since the Legislature has declared that participant monitoring is lawful in § 11–35–21(c)(2), there is no need for it to make any additional provision. The rules of evidence govern their admissibility at trial. The tapes and transcripts are clearly relevant, and defendants have not claimed that their admission has otherwise violated a rule of evidence which would warrant their exclusion. *See McCormick's Handbook of the Law of Evidence*, § 53 at 121 (2d Ed.Cleary 1972). On this issue the United States Supreme Court has concluded:

"The function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant. Proper fulfillment of this function requires that, constitutional limitations aside, all relevant, competent evidence be admissible, unless the manner in which it has been obtained—for example, by violating some statute or rule of procedure—compels the formulation of a rule excluding its introduction in a federal court." *Lopez v. United States*, 373 U.S. 427, 440, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462, 471 (1963).

 Pugh and Carlin argue that if the Legislature intended to exempt participant monitoring from the provisions of chapter 5.1 of title 12, it would have included the exception in the body of chapter 5.1 and not in chapter 35 of title 11 dealing with criminal offenses and public utilities. We do not agree. Both provisions were part of the same act, House Bill No. 1564, approved May 2, 1969. Public Laws 1969, ch. 55, §§ 1–4. The fact that the two provisions have become parts of two separate sections of the General Laws in no way indicates that the Legislature did not intend to adopt both. The clear implication is that the Legislature intended that consensual interceptions of communications would not be subject to the procedural requirements of chapter 5.1.[4] In reaching this conclusion,

---

4. Our finding concurs with the Federal Wiretap Statute which served as a model for this state's legislation in that the federal act specifically

exempts participant monitoring from its provisions. Section 2511(2)(c) of the Omnibus Crime Control and Safe Street Act of 1968 as

we follow our rule of statutory construction which provides that statutes which relate to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope. This rule of construction applies even though the statutes in question contain no reference to each other and are passed at different times. *Pickering v. American Employers Insurance Co.*, 109 R.I. 143, 148, 282 A.2d 584, 587 (1971). The fact that the statutes in question were passed as part of the same public law strengthens our conclusion. When the legislative intent behind a statute is clear, we are obliged to interpret statutes consistently with such intent. *State v. Smyth*, R.I., 397 A.2d 497 (1979).

The holding in *State v. Ricci, supra*, that § 12–5.1–10 established the precise circumstances under which intercepted oral or wire communications may be disclosed does not require a contrary result. *Ricci's* holding dealt with the scope of the tangible-evidence statute, § 12–17–16, and was not an analysis of the statutes governing interception of wire and oral communications. Also, the quoted language is a correct finding of legislative intent in that § 12–5.1–10 does establish the precise circumstances for disclosure of communications that are within the purview of chapter 5.1. Our conclusion that participant monitoring was not intended to be included in that chapter renders the language in *Ricci* inapplicable to the present situation.

Defendants Pugh and Carlin next raise a constitutional issue regarding the legality of the monitoring and recording of Ormiston's conversations. Specifically, they contend that participant monitoring entails a significant invasion of privacy which violates the Rhode Island Constitution, art. I, sec. 6.[5]

This issue had been decided by the United States Supreme Court under the Fourth Amendment in *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, *reh. denied*, 402 U.S. 990, 91 S.Ct. 1643, 29 L.Ed. 156 (1971). The issue in *White* involved the admissibility of testimony of government agents who related certain conversations that had occurred between the defendant and a government informant which exchange the agents overheard by monitoring the frequency of a radio transmitter concealed on the informant. The Court concluded:

"If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case. *See Lopez v. United States*, 373 U.S. 427 [83 S.Ct. 1381, 10 L.Ed.2d 462] (1963). Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police." *Id.* at 752, 91 S.Ct. at 1126, 28 L.Ed.2d at 459.

The Court then analyzed the issue in terms of the greater accuracy that a recording has over the unaided memory of an informant.

"We are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question." *Id.* at 753, 91 S.Ct. at 1127, 28 L.Ed.2d at 459.

The reasoning in *White* is very persuasive. We hold, therefore, that Pugh and Carlin's art. I, sec. 6, rights were not violated by the

---

amended provides, "(c) [i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

**5.** Article 1, section 6 of our State Constitution is very similar to the Fourth Amendment to the

United States Constitution and provides, in part, as follows:

"The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause * * *."

introduction of the tapes and transcripts of their conversations with the informant Ormiston. The defendants point out that in the past, this court has recognized that "we could establish a higher standard of protection to our citizens than might otherwise be afforded under the fourth amendment." *State v. Luther*, 116 R.I. 28, 29, 351 A.2d 594, 595 (1976). *State v. Maloff*, 114 R.I. 380, 389, 333 A.2d 676, 681 (1975). We do not feel it necessary to do so on the facts of this case. Both *Luther* and *Maloff* involved wiretaps placed *without consent*, as part of a gambling investigation. They are factually very different from the case before us. Although situations could arise in which participant monitoring might lead to abuses by law enforcement officials, clearly there has been no abuse here. Before Ormiston's conversations were monitored and recorded, he had already informed the State Police of the criminal activities he had knowledge of and had provided the police with samples of narcotics to corroborate his reports. The State Police, therefore, had adequate reason to justify the monitoring of Ormiston's conversations with his consent.

 The defendants Pugh and Carlin next claim error in the admission of the transcripts made from the tapes of the monitored conversations we have just discussed. They also claim that the trial justice erred by allowing the jury to have the transcripts in their possession during their deliberations. The second point need not detain us long. It is well settled that it is within the sound discretion of the trial justice to allow transcripts to be used by the jury during their deliberations once they have been properly admitted as a full exhibit. *State v. Blankinship*, 127 Ariz. 507, 622 P.2d 66 (1980); *People v. Fujita*, 43 Cal.App.3d 454, 117 Cal.Rptr. 757 (1974), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1952, 44 L.Ed.2d 451 (1975); *Raimondi v. State*, 265 Md. 229, 288 A.2d 882, *cert. denied*, 409 U.S. 948, 93 S.Ct. 293, 34 L.Ed.2d 219 (1972). The key question is whether the transcripts were, in fact, properly admitted.

 Generally, the admission of transcripts into evidence is within the sound discretion of the trial justice. Courts have differed somewhat however on the conditions which should be met as a prerequisite before a trial justice will be found to have properly exercised that discretion. One group of cases holds that transcripts should ordinarily not be admitted into evidence unless both sides stipulate to their accuracy and proper limiting instructions are given to the jury. *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975); *United States v. Carson*, 464 F.2d 424 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *United States v. Koska*, 443 F.2d 1167 (2d Cir.) *cert. denied*, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971). *Springer v. United States*, 388 A.2d 846 (D.C.App.1978). Other courts have said that there should be some testimony concerning the accuracy of the transcripts as well as a limiting instruction to the jury. *Dismuke v. State*, 152 Ga.App. 188, 262 S.E.2d 490 (1979); *State v. Debellis*, 173 N.J.Super. 215, 413 A.2d 986 (Mo. App.1980). Finally other courts have held that the admission of transcripts is proper when the defendant has been unable to demonstrate any prejudice resulting from their use. *People v. Fujita, supra; State v. Brown*, 607 S.W.2d 881 (Mo.App.1980).

 This issue is one of first impression in Rhode Island. We believe that the primary concern of the trial court when transcripts are used is their accuracy. In order to attempt to ensure accuracy however, we do not believe it is necessary for the parties to stipulate to it. Absent a stipulation, accuracy may be shown in other ways. The trial justice may conduct a hearing before or during trial in which he reviews the tapes and transcripts. If convinced of their accuracy, he may then admit the transcripts, in his sound discretion. Another permissible way to ensure accuracy is for the person who made the transcripts to testify regarding their preparation and thereby subject himself to cross-examination regarding their accuracy. Once transcripts are admitted into evidence, the trial justice should instruct the jurors that they

are the final arbiter of their accuracy and reliability and that if the jurors perceive any differences between the tapes and the transcripts, they must rely on the tapes. This instruction would minimize the possibility that the jurors will place too much importance on the transcripts without exercising their independent judgment. When during deliberations a jury requests that tapes or any other recordings be replayed, such replaying and the use of transcripts should occur in the courtroom under the supervision of the trial justice and in the presence of the parties and their attorneys.

■ In the case before us, the trial justice did not give a cautionary instruction to the jury when he admitted the transcripts. The absence of this instruction, however, is not reversible error under the facts of this particular case. The transcripts were prepared by the State Police, and Detective Sergeant Richard Sullivan testified to their accuracy. His testimony was uncontradicted. In their claim of error, defendants Pugh and Carlin have not in any way questioned the accuracy of the transcripts. Absent such a challenge, the need for a cautionary instruction is not demonstrated.

■ Pugh and Carlin have also not shown that the admission of the transcripts in evidence resulted in prejudice to them. A factor in this particular case which makes prejudice not likely is that the jury had the opportunity to listen to the tapes during the trial. There has been no allegation that the tapes were of such poor quality as to make them unreliable. Each juror was furnished a copy of the transcripts for his or her convenience in following the tapes as they were played in the courtroom. Pugh and Carlin did not object at the time to this use of the transcripts by the jury.

■ We hold, therefore, that the admission of the transcripts by the trial justice was not an abuse of discretion as no prejudice resulting from its use has been demonstrated.[6]

Pugh and Carlin next contend that the trial justice erred in not suppressing the tapes of conversations involving them which were the product of a wiretap on James O'Connell's telephone, for which wiretap an application to the court had been granted. They claim that the wiretap authorization was improper because the state did not meet the requirements of § 12–5.1–2(b)(3), which provides that the application must contain "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

■ Although we recognize that strict compliance with the terms of the wiretap statute is required, *State v. Luther* and *State v. Maloff*, both *supra*, there is still no merit in defendants' contention. The presiding justice authorized the wiretap on March 31, 1975, after finding, among other things, that § 12–5.1–2(b)(3) had been complied with. *See* § 12–5.1–4(3) (issuance of orders by the presiding justice).

■ Strict compliance with the statute does not mean, as contended by defendants, that a wiretap may not issue except upon a showing of absolute necessity. All that must be strictly complied with is the requirement that the state provide a full statement setting forth why investigative procedures have failed or are reasonably likely to fail or that they are too dangerous.

■ We are satisfied that the requirement has been met. In the application for the wiretap, Detective Sullivan stated that Ormiston was unaware of the names of the out-of-state suppliers of drugs and weapons; that Ormiston was unaware of the identities of the individuals involved in extortion; that Ormiston refused to seek actively the identities of the extortionists and

6. Pugh and Carlin have also contended that the admission of the transcripts violated the best-evidence rule. While it is true that the tapes themselves are the best evidence of the conversations, *United States v. McMillan*, 508 F.2d

101 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), the best-evidence rule is not violated because the tapes themselves are in evidence. *State v. Brown*, 607 S.W.2d 881 (Mo.App.1980).

out-of-state suppliers of drugs and weapons because of the personal dangers involved; and that Ormiston would have no occasion to inquire about the identities without raising suspicion. Ormiston's fear that harm would come to him if he had raised suspicion by attempting to uncover the identities of the others is a reasonable one. This is so especially in view of the fact that one element of the conspiracy was a group of persons whose identities were unknown to Ormiston, who were paid to harm people physically for nonpayment of debts and presumably for other reasons as well. The reasonableness of the danger involved set forth in the application for the wiretap satisfies §§ 12–5.1–2(b)(3) and 12–5.1–4(3). The defendants' assertions that other techniques could have been utilized by the State Police to uncover the identities of the others involved are pure speculation. The police authorities and the hearing justice were fully justified in relying on and responding to the information they possessed at the time of the application for the wiretap.

### III

The next issues raised by Pugh and Carlin involve their convictions on the conspiracy count of the indictment. They both claim that there was insufficient evidence to sustain their convictions of involvement in one large conspiracy involving drugs, weapons, and extortion. At most, they claim, the evidence shows involvement in a conspiracy dealing in drugs only. They contend, therefore, that the trial justice erred in not granting their motions for judgment of acquittal and their motions for new trial. They also claim that the trial justice erred in his charge to the jury.

The standards applicable when a trial justice is called upon to rule on a motion for judgment of acquittal and a motion for new trial have been restated many times by this court. On a motion for judgment of acquittal the trial justice is required to view the evidence in the light most favorable to the state, giving full credibility to the state's witnesses and drawing every reasonable inference consistent with guilt. *State v. Di-*

*Muccio*, R.I., 431 A.2d 1212 (1981); *State v. Jefferson*, 116 R.I. 124, 353 A.2d 190 (1976). On a motion for new trial the trial justice must evaluate the evidence in the record, assess the credibility of the witnesses, and draw any inferences that can reasonably be drawn from the evidence. *Barbato v. Epstein*, 97 R.I. 191, 196 A.2d 836 (1964). After performing these functions, if the trial justice is convinced that there is sufficient evidence to submit the case to the jury, he or she must deny the motion for judgment of acquittal; and if the evidence was sufficient to support the verdict, when the trial justice considers the evidence as the thirteenth juror, he or she must also deny the motion for new trial.

 With regard to defendant Pugh, we conclude that the trial justice properly denied the motions for judgment of acquittal and new trial. Although the large quantity of pills Pugh sold to O'Connell and Ormiston proved, upon analysis, not to be amphetamines, there was evidence that the jury could find credible. Pugh met with O'Connell and Ormiston on or about February 6 and 26, 1975, to discuss a prospective marijuana sale. Pugh also discussed with them the possibility of weapons sales in the future, mentioning out-of-state connections as a source of such weapons. Pugh was shown some financial records of the corporation said to be records of weapons transactions. The fact that Pugh never carried through on his claim to be able to obtain drugs and guns is not material. Once a common unlawful agreement has been made, the crime of conspiracy is complete. Whether or not the agreement is successfully or substantially carried out is of no consequence. *State v. LaPlume*, 118 R.I. 670, 375 A.2d 938 (1977); *State v. Giorgi*, 115 R.I. 1, 339 A.2d 268 (1975).

 The remaining element of the conspiracy conviction involves the use of extortion to enforce the payment of drug-and-weapons-related debts. Pugh correctly points out that there is no direct evidence tying him with the extortion element of the conspiracy. Although common agreement is the gravamen of any criminal conspiracy,

it is usually difficult to prove in complete detail the explicit terms of such an agreement. Consequently, the conspirator's goals may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties. *State v. Murphy*, 113 R.I. 565, 576, 323 A.2d 561, 566 (1974).

We are of the opinion that the evidence does inferentially establish guilt on Pugh's part for conspiracy to extort. Anyone dealing in narcotics is presumed to know that he is a participant in a venture extending far beyond his personal involvement. *United States v. Magnano*, 543 F.2d 431, 434 (2d Cir. 1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977). A charge of engaging in a far-reaching conspiracy cannot be avoided by showing that what the accused conceived to be a limited conspiracy turned out to be a conspiracy of wider scope of which the smaller conspiracy was, in fact, only an element. *United States v. Manton*, 107 F.2d 834, 839 (2d Cir. 1938), *cert. denied*, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1939). Recently this court had occasion to reaffirm the principle that each member of the conspiracy is responsible, civilly and criminally, for everything that may consequently and subsequently result from such unlawful purpose. *State v. Barton*, R.I., 427 A.2d 1311 (1981); *State v. Miller*, 52 R.I. 440, 161 A. 222 (1932).

Pugh cannot plausibly argue that he at no time gave any thought to the collection of money in payment for the illegal merchandise. Persons conspiring to deal in drugs and weapons in large amounts must be presumed to know that illegal methods will be resorted to if payments are not willingly made. Common sense tells anyone that money collection in such enterprises can only be accomplished through fear resulting from force, threats, and intimidation. Since the record contains sufficient evidence tying Pugh to the conspiracy through his agreement to obtain drugs and weapons, the jury could properly infer from the size and nature of the Whitebird con-

spiracy that Pugh had knowledge of the extortion elements of the conspiracy as well.

Turning now to defendant Carlin, we find that he was entitled to a directed verdict of acquittal on the conspiracy charge. Whereas the evidence tying Carlin to the drug aspect of the conspiracy was overwhelming and the extortion element can be inferentially established from such participation, the record is devoid of any evidence that establishes, either directly or inferentially, that Carlin had knowledge of any weapons transactions. None of the conversations about weapons testified to by Ormiston occurred in Carlin's presence. Although we have concluded that a conspiracy to sell drugs in large amounts raises an inference of conspiracy to coerce the collection of debts arising from such sales, we cannot say that the involvement in drug sales raises an inference of agreement to traffic in weapons also. One agreement does not encompass the other. To prove the existence of a conspiracy, the evidence and the reasonable inferences derived therefrom must show that the conspirator knew the scope of the agreement. In the absence of such proof, the conspiracy charge may not stand. *See State v. Giorgi, supra*, and *State v. Gilman*, 110 R.I. 207, 291 A.2d 425 (1972).

We hold, therefore, that there was insufficient evidence to prove that Carlin agreed to deal in weapons or that he had any knowledge of that aspect of the conspiracy. Since Carlin was convicted of one conspiracy encompassing three elements rather than three separate conspiracies, we must reverse Carlin's conspiracy conviction and direct a judgment of acquittal in regard to that charge.

We next consider the jury instructions that Carlin and Pugh claim were erroneous. The thrust of this argument is that the evidence established several separate conspiracies rather than one, and defendants, therefore, were entitled to an instruction that if the evidence did establish several

separate conspiracies, the state had failed in its burden of proof.[7]

 The trial justice's instructions to the jury included a clear definition of conspiracy and an explanation of the criminal responsibility of a person who knowingly participates in a conspiracy. The jury was also instructed that reasonable inferences of guilt could be drawn from the credible evidence. In view of our holding regarding the inferences that could reasonably be drawn from the evidence in this record, the specific instructions requested by defendants were unnecessary. The trial justice is free to instruct the jury in his own words in a criminal proceeding, as long as he or she states the applicable law. *State v. Verdone*, 114 R.I. 613, 619, 337 A.2d 804, 809 (1975). Here, the instructions given were adequate and clearly conveyed the principles of law involved. We see nothing in them that would mislead or confuse the jury.[8]

### IV

Next Carlin claims as error the fact that he was convicted of possession of a con-

trolled substance as well as delivery of the same controlled substance. At the close of the state's case, Carlin moved for dismissal of the possession charge as a lesser included offense of the delivery charge. The motion was denied and Carlin was later sentenced on both charges.

 Because of the protections afforded by the Fifth and Fourteenth Amendments, multiple sentences may not be imposed for conduct constituting the same criminal act. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *North Carolina v. Pierce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

In determining what constitutes the same criminal act, the United States Supreme Court has fashioned a test referred to as the "same evidence" test.

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockberger v. United States*, 284 U.S.

---

7. Since Carlin's conspiracy conviction is being reversed, this issue is applicable only to Pugh.

8. Excerpts from the judge's charge are as follows:

"The crime of conspiracy involves a combination of two or more persons to commit some unlawful act or to do some lawful act for an unlawful purpose. The offense is complete once the agreement is made. Conspiracy is a single offense, even though the agreement on which the charge is founded may envision the commission of several substantive criminal offenses or acts. * * * [T]he state says that they conspired to do these three things that I just read to you. Anyone knowing of the conspiracy who intentionally takes part in or does any act to further the illegal agreement, becomes a participant in the conspiracy. Furthermore, there need not be any evidence that the participants came together and expressly agreed to pursue a common design. It is enough they knowingly engaged in the mutual plan to do a forbidden act. * * * The illegal conspiracy * * * may be inferentially established by proof of the relation, conduct, circumstances and actions of the parties. * * * [A] conspiracy to commit a crime, and the commission of the crime itself are two separate and distinct offenses. When two or more persons knowingly combine to

commit a crime, the crime of conspiracy has been committed even though the object of the conspiracy, that is the commission of the crime[s] themselves * * * was never consumated. [E]very act and declaration of every conspirator in pursuance of the considered plan or with reference to the common object[ive], being regarded in [the] law as the act and declaration of all and therefore [as] original evidence against each of them * * * everyone who does enter into a common purpose or design is generally deemed in [the] law a party to every act which had been done before by the others, and [is] a party to every [act] which may afterwards be done by any of the others in furtherance of the common design. * * * But it is not essential that there be a direct contact between the parties, or that all enter into the conspiratorial agreement at one and the same time. It may be that the alleged conspirators have never seen each other, and have never corresponded. One may have never heard the name of the other and yet by the law they may be parties to the same common criminal agreement. [T]he [act] and declarations of any of the conspirators in furtherance of the common design may be given in evidence against any other conspirator[s]."

299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932).

This court has applied the "same evidence" test several times. *See State v. Pope, supra; State v. Davis*, R.I., 384 A.2d 1061, 1064 (1978). Although we held in *State v. Anil*, R.I., 417 A.2d 1367 (1980), that "proof of possession with intent to deliver required proof of no additional fact that was not an essential fact of proof of delivery," we did observe that proof of "delivery" required additional or different evidence from the fact of "possession." *Id.* 417 A.2d at 1374. Later, however, in *Sharbuno v. Moran*, R.I., 429 A.2d 1294, 1295 (1981), this court held that "the offense of simple possession of a controlled substance in violation of G.L. 1956 (1968 Reenactment) § 21–28–4.01(C) is a lesser included offense of delivery of a controlled substance under §§ 21–28–4.01(A) and 21–28–4.-07(A)."

■ Nevertheless, we can perceive fact-situations that would give rise to charges of both possession and delivery in which situations this court did not intend *Sharbuno v. Moran, supra*, to preclude prosecution and imposition of sentence. When there is clear evidence that a defendant has possession and control of a substantial cache of drugs from which he delivers quantities in a series of sales or transfers, he clearly could be tried and sentenced for both possession and delivery.

■ In this case after paying O'Connell $1,200 for a prior transaction, Carlin told Ormiston and O'Connell that he had access to "more opium" if there was a market for it. Assured that there was, Carlin left the house and returned a short time later with three ounces of opium. Although there is justification for drawing an inference that Carlin was in possession of a supply of opium from which he could draw at will, we believe that it would be better to apply the rule of *Sharbuno v. Moran* in this situation since the evidence for finding a separate supply of drugs is merely inferential. Consequently we sustain Carlin's appeal on this issue and order dismissal of his possession charge as a lesser included offense in the charge of delivery for which he was convicted and sentence was imposed.

V

Pugh next alleges that the trial justice was in error when he limited the cross-examination of Ormiston regarding any use of drugs by him during his first meeting with Pugh. Ormiston had testified on direct examination that he had met with Ahmadjian and O'Connell approximately fifteen times and that marijuana had been smoked at some of the earlier meetings. During this time Ormiston had not yet met Pugh. The February 6, 1975 meeting among Pugh, Ormiston, and O'Connell took place in a rear bedroom at O'Connell's residence. As previously indicated, Pugh discussed prospective marijuana and weapons deals at this meeting.

On Ormiston's cross-examination, Pugh's counsel asked if anyone had been smoking marijuana during this meeting even though there was no testimony to this effect on direct examination. The court sustained the prosecution's objection, and defense counsel asked only that his exception be noted. Pugh now claims prejudicial error.

■ The scope of cross-examination is within the sound discretion of the trial justice and his rulings thereon will be reversed only for an abuse of discretion. *State v. Benevides*, R.I., 420 A.2d 65 (1980). In *Handy v. Geary*, 105 R.I. 419, 252 A.2d 435 (1969), this court considered the same issue involving the use of intoxicants by a witness and set forth a procedure to be followed when the issue of intoxication is raised.

"[B]efore evidence of drinking of intoxicants may be presented to the jury, the trial justice shall conduct a preliminary evidentiary hearing on this issue in the absence of the jury. If he finds that the evidence is such that different minds can naturally and fairly come to different conclusions on the question of intoxication, as we have defined that term, then and only then, may evidence of drinking be admitted under proper instructions for

ultimate determination of such question by the jury under the same test." *Id.* at 431, 252 A.2d at 441–42.

In *State v. Amaral*, 109 R.I. 379, 285 A.2d 783 (1972), this procedure was extended to criminal cases.

 The issue in the instant case, use of marijuana, is no different from situations involving the use of intoxicants. Evidence of intoxication is admissible for the purpose of attacking the credibility of a witness and to test his competency, his ability to perceive and remember and to communicate the subject matter of his testimony. *O'Brien v. Waterman*, 91 R.I. 374, 163 A.2d 31 (1960). These are the same reasons Pugh gave for desiring to cross-examine into any use of marijuana by Ormiston. Furthermore, in *State v. Mattatall*, 114 R.I. 568, 337 A.2d 229 (1975), the court approved of a trial justice following the *Handy* voir dire procedure in a case in which defense counsel desired to cross-examine a witness concerning both alcohol and narcotics.

 Pugh at no time advised the court that he had evidence of impaired ability of Ormiston nor did he offer any basis for a belief that such was the case. Counsel for Pugh stated to the court only that "[i]f there is other activity going on that would distract one from the business at hand, I think I can inquire into it." This is true provided counsel can assert that there was other activity or can assert reasons for his belief that such was the case. In the absence of such a representation, we conclude that the trial justice acted within the bounds of his discretion in limiting the cross-examination.

## VI

 The final issue raised by Pugh is whether the instant case, consistent with our opinion in *State v. O'Coin*, R.I., 417 A.2d 310 (1980), should be remanded for a hearing on the constitutionality of the composition of the grand jury that indicted the defendant. In *O'Coin*, this court pointed out that in order for a defendant to challenge the constitutionality of a grand or petit jury, he must file a motion prior to

trial pursuant to Rule 12(b)(2) and (3) of the Superior Court Rules of Criminal Procedure. *Id.* 417 A.2d at 313. No one disputes that the defendant did not file this motion prior to his trial. Under these circumstances, failure to follow this procedure amounts to a waiver of any further consideration of the issue.

Based on the foregoing, the appeals of defendants Ahmadjian and Pugh are denied and dismissed; defendant Carlin's appeal is granted in part and denied in part. A judgment of acquittal will enter for Carlin on the charge of conspiracy and on the charge of possession of opium. All other judgments of conviction are affirmed. The papers of the case are remanded to the Superior Court.

BEVILACQUA, C. J., and WEISBERGER, J., did not participate.