STATE of Missouri,
Plaintiff–Respondent,

v.

Kevin Neil BROWN,
Defendant–Appellant.

No. 11614.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 6, 1980.

John G. Newberry, Springfield, for defendant–appellant.

John Ashcroft, Atty. Gen., Nancy D. Kelley, Asst. Atty. Gen., Jefferson City, for plaintiff–respondent.

MAUS, Judge.

The defendant was charged and convicted by a jury of robbery in the first degree and was sentenced to 15 years' imprisonment. Viewing the evidence most favorably to the state as required by the jury verdict, *State v. Franco*, 544 S.W.2d 533 (Mo. banc 1976), there was evidence from which the jury could have found the following facts. On February 14, 1979, Paul Bowles had the use of his family's automobile and picked up his

acquaintance, the defendant. The two drove to Mt. Vernon to the home of Paul Magadanz, a friend of the defendant. There they played pool and drank for several hours. They returned to Springfield where they bought some beer and whiskey. After a stop in Springfield, they returned to the Magadanz home. This time only the defendant entered and he returned with a Crossman .22 caliber pellet gun. The two decided to rob someone.

They returned to Springfield and drove to a motor inn. There they saw Larry Michael Sauer, a guest at the motor inn, parking at one of the accommodation units. While Sauer was in the process of getting out and unloading, the two approached from their parked car. One came to the left of Sauer's car and the other to the right. As he started to walk from his trunk to the building as Sauer related: "One of them stuck a gun in my belly and said 'This is a stickup', or something to that effect. I said 'Well, I don't have much money,' and he said something like 'I don't care, get it out.' And I reached in and handed him my wallet and glanced back around and was hit in the head and fell to the ground." He was hit with something he observed being similar to a toy baseball bat. As soon as Sauer regained his senses, he went to the office and the police were called. This call was received at 9:42 p. m.

After leaving the scene the two went to a liquor store where the defendant used one of Sauer's credit cards to buy some beer and a bottle of Old Charter. Then, about 10:00 to 10:30 p. m. they went to the Cedar Shake for drinking and dancing. They left about 12:00 midnight. They started west on I–44. On the route they used the Sauer credit card to purchase gasoline. They wandered, driving and drinking, into Oklahoma. There they were apprehended at 8:30 a. m. when they left a filling station without paying for gasoline. At that time, there was found in the automobile, among other things, a Crossman .22 caliber pellet gun, a stick or small piece of wood, and a bottle of Old Charter. When he was booked, the defendant attempted to conceal under his belt three credit cards and a driver's license belonging to Sauer.

The basic facts of the robbery were established by the testimony of Sauer. He identified the defendant as one of the two men who robbed him, the one who hit him on the head. Bowles, a juvenile, was called as a witness by the state. He confirmed the general facts of the robbery and provided much of the background information. He stated that it was the defendant who wielded the gun and he, Bowles, hit Sauer on the head.

The defendant testified. He admitted being with Bowles and one trip to Mt. Vernon. He said that upon leaving, Magadanz gave him the gun for repairs. He denied a second trip to Mt. Vernon. He testified that he and Bowles drove to the Cedar Shake at 9:00 p. m. He left Bowles in the car and went into the building. He did not see Bowles again until about 11:30 p. m. in the parking lot. He related that then Bowles found, or purported to find, Sauer's wallet in the parking lot. The defendant confirmed the use of the credit card to purchase liquor. He generally confirmed the trip to Oklahoma with prior stops at his mother's and again at 3:00 a. m. at the Magadanz home. Defendant presented four witnesses who saw him at the Cedar Shake, two fixing the time at 9:30 p. m. However, the jury did not believe that alibi. In addition to the testimony of Bowles, a basis for this disbelief could have been found in the defendant's statement to a Springfield officer that he, the defendant, went to the Cedar Shake but did not go in and that it was he who found the wallet; the improbability of the two entering the Magadanz home at 3:00 a. m., playing pool and not awakening the occupants; Virginia Magadanz's confirmation of two trips to Mt. Vernon; and the defendant's incriminating phone call hereafter related.

The defendant's first point is that the trial court erred in not suppressing Sauer's in–court identification of the defendant because it was tainted by an impermissibly suggestive photographic line–up. On February 20, 1979, a Springfield police officer

interviewed and photographed the defendant in Oklahoma. On February 23, 1979, the picture, with five others, was shown to Sauer for identification. Sauer was certain the picture he identified (which was of a clean–shaven defendant) was of one of the men who robbed him; he believed he was the one who hit him on the head. The defendant's contention is based upon the premise that despite the description given to the police by Sauer that the one who hit him on the head was clean–shaven; the men in the other five photographs had facial hair to one degree or another. He emphasizes this argument by referring to Bowles' testimony that the defendant wielded the gun. Whether the defendant wielded the club or the gun, as there was evidence to support either hypothesis, is not decisive. *State v. Easton*, 577 S.W.2d 953 (Mo.App.1979).

■ Even assuming the photographic line–up was impermissibly suggestive, that fact is not determinative. "If there is proof of an independent source of observation on which a witness has based his identification testimony, the court need not examine the details of the questioned lineup procedures for impermissible suggestiveness." *State v. Csolak*, 571 S.W.2d 118, 123–124 (Mo.App. 1978). Such an independent source has been established upon the basis of observation of the criminal by the witness for 15 seconds on a 14–inch television screen, *United States v. Mooney*, 417 F.2d 936, 939 (8th Cir. 1969); 10 seconds at a distance of eight feet, *State v. Davis*, 530 S.W.2d 709, 712 (Mo.App.1975); three seconds at a distance of 30 feet, *State v. Young*, 534 S.W.2d 585, 589 (Mo.App.1976).

■ There was evidence that the area in question was lighted and that Sauer observed the two men involved as they walked toward the car for two or three minutes; he saw the face of the defendant for 30 seconds to a minute. He then briefly saw the man who stuck the gun in his stomach and for a few seconds the man who hit him on the head. On the motion to suppress, Sauer testified that he was certain the picture of the defendant was a picture of one of the men who attacked him, he believed the one at his back. At the trial Sauer testified the defendant struck him and referring to the defendant, further testified, "Q. Is this one of the men who robbed you on that night? A. Yes sir. Q. Is there any doubt in your mind about that? A. No Sir. Q. Looking at him right now. A. Yes sir, that's one of them." The trial court found there was an independent basis for Sauer's in–court identification and that finding is supported by the evidence.

■ The defendant's second point concerns a picture of him taken when he was booked in Oklahoma. He alleges the picture was important exculpatory evidence because Sauer had described the man who wielded the club as clean–shaven and that at the time he had a beard. He asserts the picture would show he did have a beard. His point is that he did not receive a fair trial because the state suppressed that exculpatory evidence and the trial court refused to grant a continuance to give him an opportunity to get that picture. The subject of the picture was opened up by defense counsel asking one of the deputy sheriffs from Oklahoma if the Springfield police knew the photograph was made. That officer replied that he didn't know. Defense counsel then said he would like to see the pictures. "If those photographs exist, I'd like to have an opportunity to get them." He then asked for a continuance for that purpose. The prosecuting attorney responded that he assumed such a picture may have been taken, but he had no knowledge of the picture other than the expressed supposition it was made and that it was not in the possession of the state of Missouri. Later, another deputy sheriff from Oklahoma said "mug shots" were taken and he thought the officers from Springfield took them. However, the subject was developed no further and no additional objections or requests were made. If the state had willfully and knowingly suppressed exculpatory evidence, the point would require further consideration. However, the record does not support such an assertion. *State v. Rapheld*, 587 S.W.2d 881

(Mo.App.1979); *State v. Leigh*, 580 S.W.2d 536 (Mo.App.1979).

The granting of the defendant's request for continuance was for the sound discretion of the court. *State v. Oliver*, 572 S.W.2d 440 (Mo. banc 1978). At the time the request was made, it had not been shown to the court the picture had actually been taken. The defendant obviously knew his picture had been taken. If he deemed that picture to be of importance, he should have shown some interest in obtaining its presence before his trial started. Further, there was an overnight recess after the request was made. Nowata, Oklahoma, is not such a distance from Springfield, Missouri, that the picture could not have been obtained during that recess. Yet the defendant demonstrated no effort to do so or to have that done. The trial court did not abuse its discretion in denying the request.

The defendant's next three points concern a tape recording of his telephone call to Bowles. Bowles had received several anonymous threatening phone calls. The prosecuting attorney had supplied him with a tape recorder to attach to his phone. Before the call in question, the defendant had made an overture to Bowles for Bowles to retract his statement concerning the defendant's participation in the crime. The call in question was made two days before the scheduled trial. The recording contains statements by the defendant such as: "I was trying to get together with you so we could, you know do something, I can give you, you know, a grand, or whatever it took. You (inaudible) you don't even have to say anybody else, just say it wasn't me, you wasn't sure who it was, something like that.... All, I don't want you to say nothing, Man, all I want you to do is just sign a paper that gives me a chance in court, it drops the statement you made, you know, it just doesn't, couldn't stick me like that, so I have got a chance. With your statement like that, I ain't got a chance, don't have a prayer." There are several places where the voice speaking is briefly inaudible. Before trial a second tape recording was made of the original. The second was made in such a manner that it could be played with more volume. At the trial, both tapes were introduced into evidence. The second tape was played to the jury.

■ The defendant's third point is that the trial court erred in admitting the second tape recording because the original was not shown to be authentic and there was no showing how the second tape was created. The defendant cites *State v. Spica*, 389 S.W.2d 35 (Mo.1965) as delineating the test for the admissibility of a disputed recording. However, there is no need to measure the evidence concerning the authenticity of these tapes against that test. The inaudible portions were not such as to render the tapes inadmissible. *State v. Miller*, 588 S.W.2d 237 (Mo.App.1979). The defendant was permitted to give his version of the inaudible portions and his explanation that he was only trying to get Bowles to tell the truth. Bowles offered to state his memory of those portions, but the defendant declined the offer. The defendant's point is disposed of by his admission that it was his voice on the recording played to the jury.

■ The defendant's fourth point is that the trial court erred in permitting typed transcripts of the recording to be passed to the jury because the transcripts were not the best evidence. He cites *State v. King*, 557 S.W.2d 51 (Mo.App.1977). That case holds the best evidence rule is applicable to sound recordings and "would generally require the taped confession *rather than a* transcript of the recording be admitted." p. 53 (emphasis added). That rule is not applicable to this case for the tapes were introduced and the transcripts supplied *in addition* to the tapes. Such transcripts are to be used with caution to assist the jury. *State v. Montgomery*, 590 S.W.2d 105 (Mo. App.1979); *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974). Their admissibility for that purpose is for the sound discretion of the trial court. *United States v. McMillan*, supra. In this case the accuracy of the transcript is not questioned. No claim is made of a variance in meaning because of an inflection in a voice. The defendant did

not, and does not, demonstrate any unfairness in the use of the transcripts and the point is denied.

■ The defendant's fifth point is that the tapes and transcripts were not admissible because the contents were immaterial to the question of the defendant's guilt. Paraphrasing a well–known quotation, he hath protested their admission too much. The citation of legal precedent is not necessary to demonstrate the defendant's offer of $1,000.00 to Bowles for the recantation of his testimony incriminating the defendant was indeed material. The fact the defendant chose to use indecent language in his conversation does not bar its use.

■ The defendant next complains that the trial court erred in permitting the state to question him concerning whether or not he drove from a filling station in Oklahoma without paying for the gasoline. The basis of his complaint is that this is an impermissible showing of an independent crime. Bowles had testified that from the time they left the liquor store he was asleep or passed out and did not drive. The state introduced evidence that Sauer's credit card was used to purchase gasoline near Springfield and the defendant had signed Sauer's name. The defendant testified that Bowles did the driving after leaving Springfield and that Bowles used the credit card and drove off without signing. The defendant had put in issue who was driving and had, as the trial court ruled, opened up the subject. "Such questioning was within the scope and cumulative of matters brought into the case by defendant upon his examination in chief." *State v. Murphy*, 592 S.W.2d 727, 731 (Mo. banc 1979). Also see 81 Am.Jur.2d Witnesses § 587, p. 594. The trial court did not abuse its discretion in permitting such questions and the point is denied. *State v. Payton*, 559 S.W.2d 551 (Mo.App.1977).

■ The defendant's final point is that the trial court erred in giving Instruction No. 5. The pertinent part of that instruction reads as follows:

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about February 14, 1979, the defendant, Kevin Neil Brown, with the aid of Paul Edward Bowles, committed the offense of robbery in the first degree of Michael Sauer, by engaging in the conduct described in paragraphs third, fourth, and fifth of this instruction, and

Second, that Paul Edward Bowles, either before or during the commission of the offense of robbery in the first degree of Michael Sauer, with the purpose of promoting its commission, aided the defendant, Kevin Neil Brown, in committing the offense of robbery in the first degree, as described in paragraphs third, fourth, and fifth of this instruction, and

Third, that on or about February 14, 1979, in the County of Greene, State of Missouri, the defendant, Kevin Neil Brown, with the aid of Paul Edward Bowles, stole a quantity of United States currency, a wallet and its contents, owned by Michael Sauer, and

Fourth, that the defendant, Kevin Neil Brown, with the aid of Paul Edward Bowles, in doing so used physical force on or against Michael Sauer for the purpose of forcing Michael Sauer to deliver up the property, and

Fifth, that in the course of stealing the property, the defendant, Kevin Neil Brown, with the aid of Paul Edward Bowles, displayed or threatened the use of what appeared to be a deadly weapon, then you will find the defendant, Kevin Neil Brown, guilty of robbery in the first degree.

It must be noted that the court also gave Instruction No. 6 which reads as follows:

1. A person is guilty of an offense if it was committed by conduct for which he is criminally responsible, whether that conduct was his own or that of another person or both his own conduct and that of another.

2. A person is criminally responsible for the conduct of another in committing a particular offense when, either before or during the commission of an offense,

with the purpose of promoting the commission of that offense he aids such other person in committing that offense.

3. The presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make him responsible therefor, although his presence may be considered together with all of the evidence in determining his guilt or innocence.

The defendant asserts the trial court did not follow V.A.M.R.Crim. Rule 28.02(c) which requires the use of an applicable MAI–CR instruction. He correctly claims that except in connection with the submission of a conspiracy, "MAI–CR 2.10 and MAI–CR 2.12 must be given, whether requested or not, when there is any evidence that the defendant acted with others, either as an *active participant* or one who aided, agreed to aid or attempted to aid another in planning, committing or attempting to commit an offense."[1] MAI–CR2d 2.10, Notes on Use 3. (Emphasis Added).

The defendant does not question that MAI–CR 2.10 was given as required in the form of Instruction No. 6. However, he contends that Instruction No. 5 deviates from MAI–CR2d 2.12. His first complaint is that paragraph second in MAI–CR2d 2.12 requires that the names be transposed from the order in which they were used in Instruction No. 5. In other words, he contends that paragraph second should have read:

Second, that the defendant, either before or during the commission of the offense of robbery in the first degree of Michael Sauer, with the purpose of promoting its commission, aided Paul Edward Bowles in committing the offense of robbery in the first degree, as described in paragraphs third, fourth, and fifth of this instruction, and

He cites the order in which the names are used in paragraph second of MAI–CR2d 2.12. He also complains that the court erred in not giving a separate instruction defining the offense. He cites MAI–CR2d 2.12, Notes on Use 5 which provides: "If MAI–CR 2.12 is used, the court must give a separate instruction defining the offense initially contemplated, and must define any word used in the definition which must be defined according to Notes on Use under any MAI–CR form applicable to that offense."

It is obvious Instruction No. 5 does not conform to MAI–CR2d 2.12 and its Notes on Use. Upon analysis, it is apparent that MAI–CR2d 2.12 is not an appropriate verdict–directing instruction when a defendant is being tried as an active participant.[2] This is more readily visualized had Bowles' only activity been to drive the get–away car. Nor is MAI–CR2d 2.12 an appropriate verdict–directing instruction when a defendant is being tried for the offense initially contemplated by the participants. For a consideration of this problem see *State v. Clark*, No. 42104, (Mo.App.E.D. October 14, 1980). It is only if the defendant is being tried for an offense other than that initially contemplated does MAI–CR2d 2.12 provide for the submission of the elements of the offense.[3] Yet MAI–CR2d 2.12 is a verdict–directing instruction that must be used when there are two or more participants in the crime.[4] The Notes on Use to

1. Under the first MAI–CR it was provided "[t]he failure to use MAI–CR 2.10 and 2.12 will not be deemed error even if there is substantial evidence that defendant was a joint, active participant or actor so long as there is no evidence that he was only an aider or encourager." MAI–CR 2.10, Notes on Use 4.

2. In MAI–CR, first edition, a separate instruction was provided for the submission in respect to an active participant as distinguished from an aider.

3. MAI–CR2d 2.12 paragraph Third states: "(continue in this and separate paragraphs as necessary to submit each element of *the other offense* committed or attempted by such other person or persons other than the defendant)". (Emphasis Added). Also see MAI–CR2d 2.12, Notes on Use 6.

4. The following language used in connection with MAI–CR, first edition, is yet applicable: "The scheme of MAI–CR clearly contemplates the use of 2.10 in connection with either 2.12 or 2.14. The language of Paragraph 4 of the Notes on Use under 2.10, relied upon by the

MAI–CR2d 2.04 make it clear that a verdict–directing instruction must submit the elements of the crime for which the defendant is being tried. It is certainly desirable that it should. To do so, in this case, MAI–CR2d 2.12 had to be modified as provided in Rule 28.02(d). While the language of paragraph second might be improved upon, the transposition of the names adds clarity and Instruction No. 5 is an acceptable modification of MAI–CR2d 2.12. The offense being tried is defined in the verdict–directing instruction. A further and separate definition, which the defendant contends was necessary, was not necessary and would have been confusing. Notes on Use 5 to MAI–CR2d 2.12 must be read as being applicable only where a defendant is being tried for an offense not initially contemplated.

Even if Instruction No. 5 should be viewed as a deviation, as that term is used in reference to Rule 28.02(e), its use does not require reversal. *State v. Morgan*, 592 S.W.2d 796 (Mo. banc 1980). The issue in this case was clearly defined. It was, did the defendant and Bowles rob Sauer or was it Bowles and some unidentified individual? Instruction No. 5 clearly presented that issue and could not have been prejudicial. *State v. Wolfe*, 570 S.W.2d 694 (Mo.App. 1978); *State v. Macon*, 547 S.W.2d 507 (Mo. App.1977); *State v. Timley*, 541 S.W.2d 6 (Mo.App.1976). The judgment is affirmed.

BILLINGS, P. J., and HOGAN, J., concur.

state, does not mean that 2.10 may be given without a verdict–directing instruction in the form of either 2.12 or 2.14. Absent the verdict directing instruction in such language, the jury is given no instructional guide for the application of the abstract principles stated in 2.10." *State v. Timley*, 541 S.W.2d 6, 9 (Mo. App.1976).