STATE of Missouri, Respondent,

v.

Glennon E. ENGLEMAN, Appellant.

No. 62928.

Supreme Court of Missouri, Division One.

June 14, 1982.

Rehearing Denied July 6, 1982.

Richard Vouga, Clayton, for appellant.

Melinda A. Corbin, Asst. Atty. Gen., Jefferson City, for respondent.

JOHN E. PARRISH, Special Judge.

Appellant was convicted of capital murder of Sophie Marie Barrera and sentenced to life imprisonment without eligibility for probation or parole until he serves a minimum of fifty years of that sentence.

Sophie Marie Barrera died January 14, 1980, when the automobile she was driving exploded from a bomb blast. The explosion occurred about 5:00 p. m. on that date.

Previously, on March 20, 1979, another bomb, partially detonated, had been found where Mrs. Barrera parked her automobile. Dynamite was used as the explosive in the first bomb. The dynamite had become wet and only partially exploded.

Following the explosion which caused the death of Mrs. Barrera, pieces of a pressure switch were found which had been a part of the fatal bomb. That pressure switch was similar to one found in the remains from the other partially exploded bomb. The technology and expertise in the design and construction of the two pressure switches were the same. However, no determination was made regarding the type of explosives which were a part of the second bomb.

Sophie Marie Barrera had owned and operated a dental laboratory in St. Louis. Appellant is a dentist who practiced in St. Louis and was a customer of Mrs. Barrera. Since March, 1978, Appellant had owed Mrs. Barrera $14,504.37 for laboratory services. Mrs. Barrera had brought a civil action against Appellant in an attempt to collect the amount owed. She obtained a default inquiry against Dr. Engleman on March 9, 1979.

Appellant had been angry about the lawsuit. He had made threats against Mrs. Barrera to his former wife, Ruth Engleman.

On March 21, 1979, one day after the first bombing attempt, Appellant admitted to Ruth that he was responsible for that bombing.

After the first bombing attempt Mrs. Barrera discussed the civil suit with her attorney. The attorney then attempted to negotiate a settlement rather than pursue a default judgment based upon the prior default inquiry. The dispute was not settled but Mrs. Barrera did not thereafter take the steps necessary to secure a default judgment. The civil suit had been scheduled for trial the week of January 21, 1980.

After Mrs. Barrera's death, Ruth Engleman contacted agents of the Alcohol, Tobacco and Firearms Section of the United States Treasury Department. She told them of her former husband's admission that he had been responsible for the first attempted bombing of the Barrera automobile. Ruth agreed to assist in an investigation of Appellant's possible involvement in the bombing which had killed Mrs. Barrera. Ruth consented to the making of tape recordings of conversations she expected to have with Dr. Engleman. Later, during the latter part of January, 1980, and during February, 1980, several conversations between Ruth and Appellant were tape recorded.

The tape recordings were accomplished in two ways.

One series of recordings was made with a transmitting device which Ruth wore on her person. This device transmitted a signal to receiving units monitored by federal agents where recording devices were utilized to make tape recordings of the conversations. Some of these recordings were of conversations which took place at Ruth's residence. Others were of conversations at a restaurant frequented by Ruth and Dr. Engleman.

A second series of recordings was made by a recording device which was placed inside Ruth's residence. Those conversations were not monitored at any outside source but were recorded by the equipment in the residence.

In the tape recorded conversations, Appellant made various references about Mrs. Barrera and the bombing which resulted in her death as well as the earlier attempted bombing. Among those references were admitted acknowledgments of having expertise with explosive devices and receiving financial benefits as a result of Mrs. Barrera's death.

At trial, over Appellant's objections, portions of the various tape recordings were admitted as evidence and played to the jury. Transcripts of two of those recordings were provided the jury for reference during the playing of the recordings.

The trial first commenced in November, 1980. A jury was selected and sequestered and some evidence presented. However, on the morning following the first night for which the jury was sequestered, mistrial was declared due to the sheriff failing to properly sequester the jury during the prior evening. The mistrial was granted upon defendant's motion. The prosecutor made no objection to the request for mistrial.

Thereafter, the trial from which Appellant now appeals was held in January, 1981.

Appellant asserts that he was denied a fair trial for several reasons. He contends that he was subjected to double jeopardy by the earlier attempt at trial which resulted in mistrial. He further contends that error was committed by the trial court during jury selection by failing to grant two of his challenges for cause and by making certain remarks to the jury which he asserts were prejudicial. Appellant also contends that the admission in evidence of certain photographs and the tape recordings of portions of conversations between him and his former wife was error and, further, that the trial court erred in refusing to give the alibi instruction, MAI–CR 3.01, to the jury.

Indictment for capital murder was returned in the Circuit Court in the City of St. Louis. The case was tried in Gasconade County following change of venue.

I

*Double Jeopardy*

Appellant asserts that his conviction should be reversed and he should be forever discharged for the reason that he was once previously placed in jeopardy for the offense which is the basis of this appeal. Appellant contends his trial was barred by the Fifth Amendment of the United States Constitution and by Article I, Section 19 of the Missouri Constitution.

On November 12, 1980, this case was for trial. A jury was selected and testimony from five witnesses received. The jury, having been sequestered, retired in the custody of the sheriff for the evening.

The following morning, upon court reconvening, Appellant moved for mistrial for the reason that the sheriff failed to keep the jury together during the prior evening. The prosecutor did not oppose the request and mistrial was declared.

Appellant acknowledges that double jeopardy does not normally arise when a mistrial is declared upon request of a defendant. However, Appellant contends that since no inquiry was made as to whether he personally consented to his counsel's request for mistrial, any subsequent trial is barred. He relies upon *Madison v. State*, 533 S.W.2d 252 (Mo.App.1976), for that proposition.

We do not agree that *Madison* stands for the proposition for which it is cited by Appellant. In *Madison*, which was an appeal of a Rule 27.26 proceeding, in denying the

movant the relief he sought, the court alluded to the fact that the movant had personally consented, on the record at his first trial, to a request for mistrial made by his counsel. The issue presented in *Madison* was whether the consent to the previous mistrial was coerced by the trial court and by misconduct by the prosecutor. The holding in *Madison* is of no significance in this case.

There was no showing that the failure to properly sequester the jury during Appellant's first trial was motivated by bad faith or predicated by any desire to harass Appellant. The holding in *United States v. Dinitz*, 424 U.S. 600, 611–612, 96 S.Ct. 1075, 1081–1082, 47 L.Ed.2d 267 (1976), which would bar retrial had the earlier mistrial been so motivated is, therefore, not applicable. Appellant was not placed in double jeopardy for the offense which is the basis for this appeal.

## II

### *Jury Selection and Remarks by Trial Judge*

Appellant assigns as error the trial court's failure to excuse two veniremen for cause during voir dire.

During voir dire appellant challenged panel members Evelyn Brinkman and Henry Linhardt for cause. The trial court denied both challenges.

With respect to Mrs. Brinkman, Appellant asserts that the inquiry on voir dire disclosed that Mrs. Brinkman had heard about the case from radio and television reports and had discussed the case with members of her family before she was summoned as a member of the panel. Appellant apparently asserts that Mrs. Brinkman had formed preconceived opinions regarding Appellant's guilt or innocence which required her to be excused for cause. Appellant specifically refers to statements made by Mrs. Brinkman during voir dire wherein she indicated that members of her family had expressed an opinion that Appellant was guilty of the offense charged. He makes reference to her stated belief that

she could, with some difficulty, set aside the information she had previously received regarding the case if selected as a juror and to her further comment: " . . . I would rather not have to make that decision if any way possible."

As to Mr. Linhardt, Appellant's complaints are threefold. First, Appellant complains that Mr. Linhardt had heard the case discussed by others and had heard news media reports concerning the trial. Secondly, Appellant complains that Mr. Linhardt indicated that the fact the offense charged was capital murder would make it difficult or impossible for him to sit as a fair and impartial juror. Thirdly, Appellant raises an issue regarding a response by Mr. Linhardt that the panel member might not "feel comfortable" having a relative or close friend tried by a jury composed of persons with points of view like those he possessed.

Appellant asserts that the trial court should have granted Appellant's challenges for cause of Mrs. Brinkman and Mr. Linhardt. He asserts that the trial court abused its discretion in not striking those veniremen for cause and, therefore, that he was denied a qualified panel from which he could exercise his peremptory challenges.

The principles governing jury selection have been clearly enunciated. A defendant in a criminal case is entitled to a qualified panel of veniremen and the statutory number of peremptory challenges. An accused must be afforded a full panel of qualified jurors from which to make peremptory challenges. *State v. Morrison*, 557 S.W.2d 445, 446 (Mo. banc 1977), citing *State v. Thompson*, 541 S.W.2d 16, 17 (Mo.App.1976); *State v. Kirkpatrick*, 428 S.W.2d 513, 516 (Mo.1968). For a trial court to refuse to sustain a valid challenge for cause constitutes an abuse of discretion and reversible error. *State v. Land*, 478 S.W.2d 290, 292–293 (Mo.1972); *State v. Holliman*, 529 S.W.2d 932, 941 (Mo.App.1975).

However, the determination as to whether a challenge for cause should be granted can be made only upon the facts of

a particular case. This court must review the facts upon which Appellant's challenges are based and determine whether or not there was an abuse of discretion. *State v. Land*, supra at 292. Such a review is undertaken with the recognition that the trial court is in a better position to determine challenges for cause as he has the opportunity to observe the demeanor of each challenged venireman and, for that reason, all doubts as to the trial court's findings should be resolved in its favor. *State v. Wilson*, 436 S.W.2d 633, 638 (Mo.1969); *State v. McGrew*, 534 S.W.2d 549, 551 (Mo.App. 1976). "The trial court's determination will be rejected only upon a clear showing of abuse of discretion." *State v. Olinghouse*, 605 S.W.2d 58, 69 (Mo. banc 1980), citing *State v. DeClue*, 400 S.W.2d 50, 57 (Mo. 1966).

 The determination of whether the trial court's failure to grant Appellant's challenges for cause of Mrs. Brinkman and Mr. Linhardt must be based upon review of the responses of those veniremen during juror selection. A panel member's qualifications must be determined not by a part of what he or she said but by the whole examination of each. *State v. Wilson*, 436 S.W.2d 633, 638 (Mo.1969). See also *State v. Stewart*, 596 S.W.2d 758, 760 (Mo.App.1980).

Each juror was examined at length during juror selection. The trial transcript contains thirteen pages of inquiry of Mr. Linhardt and twelve pages of inquiry of Mrs. Brinkman. Those inquiries and responses have been carefully reviewed.

Although Mrs. Brinkman acknowledged that the case had been discussed by members of her household during her presence and that some of those household members expressed opinions that defendant was guilty, she further stated the belief that she could set aside what others had said in her presence and decide the case on the basis of the evidence presented at trial.

Mr. Linhardt gave similar responses to questions about previous comments concerning the trial. Mr. Linhardt acknowledged having heard the case discussed by others although he had heard no opinions

expressed as to Appellant's guilt or innocence. He had heard television or radio reports about the case. Nevertheless, Mr. Linhardt stated the belief that he could follow the court's instructions and he knew of no reason why he could not be a fair and impartial juror and give both the defendant and the state a fair trial.

At one point during the lengthy examination of Mr. Linhardt, the following exchange occurred.

"Q. [By defense counsel] All right. Now, in view of the fact that you have heard some of the publicity, let me ask you this question: If you—if you, personally, had a close friend or a relative, close relative, a son, who was on trial for the same offense, same kind of offense that this man is on trial, would you feel comfortable having your son tried by a jury of twelve people composed of—like-minded as you?

"A. No, if I had—no, I wouldn't."

This question and response occurred after Mr. Linhardt's earlier statement that he knew of no reason why he could not be fair and impartial. Following the question and response above quoted and following additional inquiry by defense counsel, the trial court inquired of Mr. Linhardt as follows.

"Q. [By the court] Okay, we missed each other. But when Mr. Dempsey [defense counsel] asked it sounded like maybe you weren't so sure. Does the nature of the case—and, of course, it's a very serious case and I think you recognize that, on the first questions Mr. Dittmeier [counsel for the state] asked you, but does the nature of the case put you in a position where you believe you could not be fair?

"A. No, I wouldn't think so.

"Q. Do you feel that, as you sit here and face me, you can be as fair as the next fellow?

"A. Yes, sir."

Thereafter, defense counsel inquired further.

"Q. Mr. Linhardt, I asked you that sort of difficult question about if you had a close friend or relative sitting where Dr. Engle-

man is sitting today, whether you could feel comfortable having that close friend or relative tried by people like-minded as you and I think you said you wouldn't feel—you couldn't feel comfortable. Now, do you still feel that way about it?

"A. Well, I don't know if I can answer that properly. If it's a relative it's a hard decision. Now if it isn't—there could be a difference there."

 Were the responses of veniremen Brinkman and Linhardt, or either of them, such that the trial court could not properly conclude that either or both of them would be fair and impartial jurors? Giving due regard to the trial court's opportunity to observe the demeanor of the veniremen, we think not. The responses of the veniremen, considering the entire examination of each, do not show an abuse of discretion by the trial court.

Mrs. Brinkman's responses did not show any conceptions "fixed and settled, nor warped by prejudice," but did show her mind to be "open to the impressions it may receive on the trial." *State v. Wilson,* supra at 638.

The same is true as to the responses by Mr. Linhardt. His responses do not show preconceived opinions about Appellant's guilt or innocence. The question of whether he would "feel comfortable" having a friend or relative tried by a jury "like-minded" as him is not determinative of his qualifications as a juror.

No error was committed in failing to excuse veniremen Brinkman and Linhardt for cause.

Appellant further asserts that a statement by the trial judge made in the presence of the jury, immediately after it was selected, was error. The statement of which Appellant complains is as follows:

"THE COURT: Ladies and Gentlemen, I'm sure you have it figured out. The twelve of you must stay. You have been picked to be the jury panel in this case.

"The eighteen of you do not have to stay. Of course, you are welcome to stay. You have invested this much of your life in this trial, you have every right to stay. It is an open, public, the word is even notorious, trial. You are more than welcome to stay. However, you don't have to stay. And if any of you wish to leave you certainly may. We will take a moment while anyone who wants to leave may."

Appellant moved for a mistrial following the trial court's statement. Appellant contends the trial court committed error by referring to the case as a "notorious trial." The trial court denied the request.

 If comments of a trial judge are such that they would reasonably tend to prejudice the minds of the jury against a defendant and deny the defendant a fair and impartial trial, a verdict against the defendant cannot stand. *State v. Dixon,* 463 S.W.2d 783, 785 (Mo.1971).

Appellant asserts the remarks of the trial judge which characterized the trial as "notorious" were such that they prejudiced the jurors' minds against him and that those remarks thereby denied him a fair trial so as to require reversal of his conviction.

In *State v. Sanders,* 360 S.W.2d 722 at 726 (Mo.1962), this court acknowledged the burdens borne by trial judges regarding remarks and conduct during trials. The responsibility of the trial judge was characterized in this language:

... [T]he court must always maintain an absolute impartiality in any trial, both in its remarks and in its conduct generally; it should not do or say anything which might prejudice the jury or be construed by the jury as indicating a belief in defendant's guilt or innocence. *State v. Hudson,* 358 Mo. 424, 215 S.W.2d 441; *State v. Castino,* Mo., 264 S.W.2d 372; *State v. Jones,* Mo., 197 S.W. 156; *State v. Bunton,* 312 Mo. 655, 280 S.W. 1040; Canons of Judicial Ethics, Canon 3.

The need for judges to be discreet in what they say or do in the presence of juries so as to avoid appearances of bias cannot be overemphasized. A trial judge must be ever mindful of how his remarks may be perceived by jurors. Not only must he not express an opinion as to an issue, he

must avoid unintentional statements which a jury might misinterpret as his opinion. It is unlikely that any trial judge who has reviewed transcripts of proceedings before him has not been surprised at some of the words he has used.

Certainly the word "notorious" can be used to cast something in an unfavorable light. Its use was probably an unfortunate choice by the trial judge. However, to determine whether the remark in which it was included would reasonably tend to prejudice the minds of jurors against a defendant and deny the defendant a fair trial, the remark must be considered in the context of its setting.

Voir dire extended over a two day period. Inquiry was made of fifty-five prospective jurors. Each venireman was questioned apart from the other panel members. The first day of voir dire was not completed until 9:50 p. m. On the second day voir dire was not completed until 5:00 p. m. The transcript contains over 500 pages of voir dire proceedings.

The trial judge's statement to which Appellant takes exception occurred after the lengthy voir dire. It occurred after numerous panel members had acknowledged that they had heard of the case before they appeared for jury service. (At the conclusion of voir dire, Appellant's counsel represented to the judge that all but two of the panel members questioned had heard about the case.)

■ In this context, we are unable to agree with Appellant that the trial judge's description of the trial as "even notorious" reasonably tended to prejudice the minds of the jurors against the defendant so as to deny him a fair and impartial trial.

Appellant, in urging that his conviction be reversed due to the trial judge's remarks, cites three cases which were reversed on appeal as a result of trial judges' remarks. The cases cited are *State v. Dixon*, 463 S.W.2d 783 (Mo.1971); *State v. Castino*, 264 S.W.2d 372 (Mo.1954); and *State v. Wendel*, 532 S.W.2d 838 (Mo.App.1975).

In *Dixon*, during closing argument, in ruling on an objection, the trial judge added regarding the duty of a prosecuting attorney, "[h]is duty is not to prosecute people that are not guilty," and, thereafter, in response to counsel's query as to whether the duty was to prosecute people who are not innocent, the trial judge responded, "[h]e sure does."

In *Castino* the trial judge told the jury that the defendant was one of three people charged with the crime in question and that one of the other defendants had already pleaded guilty but had not been sentenced.

In *Wendel*, the trial judge referred to placement of a knife marked as an exhibit saying: "Step over here with the knife, don't leave that there. Look, I don't want that exhibit left anywhere where this man can get it."

The remark made by the trial judge in this case does not rise to the level of those statements which resulted in reversals of convictions in the cases cited by Appellant. Although, the characterization of Appellant's trial as "even notorious" might be deemed an indiscretion, it did not deny him a fair trial.

### III

#### *Photographs*

■ At trial, the state introduced as evidence three colored photographs, state's exhibits 5, 12 and 14, of the body of Sophie Marie Barrera. These photographs were taken at the scene of the bombing and show the victim's body before it was removed from the debris of the destroyed automobile. Exhibit 5 is a photograph of the victim's face and upper torso. It shows her face badly soiled. Exhibit 12 depicts the lower part of her anatomy which was emaciated from the force of the explosion so as to display considerable carnage. Exhibit 14 is a view of the victim's body face down in the wreckage. The photographs were admitted in evidence over objections by Appellant.

Appellant asserts that the admission of state's exhibits 5, 12 and 14 as evidence was

error. He contends the photographs were inflammatory and prejudicial, unnecessary and irrelevant. As authority for his contention that the admission of the photographs constituted error, Appellant relies on *State v. Rainwater*, 602 S.W.2d 233 (Mo.App. 1980). However, a careful reading of the opinion in that case fails to disclose it to be authority for the proposition for which it is cited by Appellant. *Rainwater* merely restates that a trial court has wide discretion in whether to admit a photograph of a dead body and finds no error in the admission of the photograph there in question.

As stated in *State v. Burnfin*, 606 S.W.2d 629, 630 (Mo.1980):

> The trial court is afforded broad discretion in determining the admissibility of demonstrative evidence, such as a photograph, and the admission of such evidence is error only upon a showing of an abuse of discretion. [Citations.] A photograph, generally speaking, is superior to words as a means of description [citation], and it should not be rejected because by presenting an accurate portrayal it tends to be inflammatory. [Additional citations.]

The photographs corroborated testimony of witnesses who observed the victim's body at the scene of the bombing. They further tended to show that the act of killing Mrs. Barrera was done with deliberation and malice.

No abuse of discretion occurred in the admission of state's exhibits 5, 12 and 14 into evidence.

### IV

*Tape Recordings*

Appellant asserts that the trial court erred in permitting certain tape recordings of conversations between him and his former wife to be used as evidence. He contends that the tape recordings were obtained in violation of the Fourth Amendment to the Constitution of the United States and in violation of Article I, Section 15 of the Missouri Constitution in that they were products of unlawful searches and seizures.

The tape recordings in question were made of conversations between Appellant and his former wife, Ruth. The recordings were made without Appellant's knowledge or consent but with Ruth's knowledge and consent. No other persons were present during those conversations except for brief occasions when the couple's eleven year old son was with his parents.

Appellant asserts that he had a reasonable expectation to believe the conversations would remain private. He contends the acceptance of the tape recordings as evidence at his trial was error.

On March 19, 1979, an unsuccessful attempt to bomb Sophie Marie Barrera's automobile occurred. On March 20, 1979, Appellant visited Ruth's place of residence. He asked Ruth if she had heard about the incident. Appellant told her "that he was responsible for it." According to Ruth's testimony, Appellant said he had an acquaintance "that did this for him." Appellant acknowledged to her that the bomb prematurely blew up and that his acquaintance was injured.

On January 14, 1980, Ruth learned of the death of Sophie Marie Barrera from news broadcasts.

On January 19, 1980, Ruth contacted an agent of the Bureau of Alcohol, Tobacco and Firearms, United States Treasury Department, and told him of her previous discussions with Appellant regarding the March 20, 1979, attempted bombing. She agreed to wear an electronic transmitting device to permit possible future conversations between her and Appellant to be monitored and recorded.

On January 20, 1980, Ruth had another conversation with Appellant. She wore a transmitting device which broadcast the conversation and permitted its recording. That conversation occurred at Ruth's home. Six days later, on January 26, Appellant had additional conversations with Ruth. These conversations were transmitted and recorded in the same manner as had occurred January 20. The conversations which were recorded January 26 took place

at Ruth's residence and at a restaurant. Appellant's and Ruth's son, David, was present with them at the restaurant.

On January 29, 1980, agents of the Bureau of Alcohol, Tobacco and Firearms installed a battery operated tape recorder inside Ruth's residence. The device could not transmit. However, it had the capability of recording conversations. It was installed with Ruth's consent.

Appellant arrived at Ruth's residence during the early evening of January 29 after the tape recorder had been installed and departed the next morning about 10:00 a. m. A tape recording of about four hours duration was made during a portion of that time period. It was recorded by the recently installed tape recorder.

On January 31, a fourth recording was made of conversations between Ruth and Appellant. This recording was also made at Ruth's residence by use of the previously installed tape recorder.

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the United States Supreme Court considered circumstances where government agents attached an electronic listening device to the outside of a public telephone booth and recorded a defendant's end of his telephone conversation. The installation and use of the listening device was done without the defendant's knowledge or consent. The recording was declared not admissible evidence in absence of a warrant authorizing surveillance. In *Katz*, the court held that the defendant justifiably relied upon the use of a public telephone to be a private conversation free from eavesdropping by electronic devices. *Katz* eradicated the doctrine that electronic eavesdropping was permissible under the Fourth Amendment so long as physical invasion of a constitutionally protected area did not occur and thereby overruled the earlier cases of *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and *Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), as to that point.

However, *Katz* did not affect earlier cases holding that the Fourth Amendment does not protect a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoings will not breach that confidence. *Katz* protects the security upon which one relies when he places himself within a constitutionally protected area such as one's home or hotel room or automobile.[1] *Katz* protects one's individual privacy from unwarranted governmental intrusion. *Katz* does not protect one's poor judgment in revealing transgressions to his misconceived allies. Here, Appellant relied upon his former wife's confidentiality. He did not rely upon the sanctity of particular locations where he chose to converse with her. That reliance was not protected from governmental intrusion.

Ruth Engleman carried electronic equipment which transmitted Appellant's words for recording for later use as evidence. She also permitted recording devices to be maintained in her home for that purpose. As such she served as an agent for the government for purposes of obtaining evidence of Appellant's criminal conduct.[2] The Fourth Amendment affords Appellant no protection under those circumstances. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) at page 749 of U.S., 91 S.Ct. at page 1124.

In *United States v. White*, supra at 751 of 401 U.S., at 1126 of 91 S.Ct., the use of an electronic transmitting device to monitor and permit recording of an informer's conversations with a defendant was considered. In considering that question, the Supreme Court recognized that an undercover police agent might write down his conversation with a defendant for official use and later testify concerning that writing without a warrant authorizing the agent's encounters with the defendant. The court acknowledged that, for constitutional purposes, no different result would occur if the agent simultaneously recorded a conversation by use of equipment on his person or carried

---

1. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

2. *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

transmitting equipment to permit other agents to monitor the conversations or record them at another location. The court concluded at page 751 of 401 U.S., at page 1126 of 91 S.Ct.:

. . . . .

> If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

There is no assertion by Appellant that Ruth is barred from testifying in person by any privilege or established rule of law. Recordings of conversations between a defendant and a former wife, made with the consent and knowledge of the former wife, are admissable. No Fourth Amendment privilege requires otherwise. Such statements, if relevant, are admissions made by Appellant. Appellant's misplaced trust that Ruth would not divulge the statements made to her was not a constitutionally protected expectation of privacy.

Notwithstanding our finding that Appellant's Fourth Amendment expectations are unfounded, Appellant urges that Missouri adopt more restrictive principles as to searches and seizures, pursuant to Article I, Section 15 of the Missouri Constitution, than those principles required by the Fourth Amendment.

We note that tape recordings have been used in previous Missouri cases. See *State v. Spica*, 389 S.W.2d 35 (Mo.1965); *State v. Brown*, 607 S.W.2d 881 (Mo.App.1980); and *State v. Montgomery*, 590 S.W.2d 105, 108 (Mo.App.1979). Certainly, the use of evidence obtained by electronic eavesdropping is fraught with Constitutional dangers. However, after careful review of federal decisions relating to electronic surveillance and the rationales thereof, we do not believe Article I, Section 15 requirements to be more restrictive than those of the Fourth

Amendment. The trial judge did not err in holding that the tape recordings admitted in evidence were not products of unlawful searches and seizures.

Appellant next complains that the use of transcripts by the jury of two tape recordings admitted as evidence was error.

Initially, at trial, the state planned to play certain tape recordings of conversations between Appellant and his former wife for the jury. After establishing by testimony the identity of the participants in the conversation and the accuracy of the recording, a first tape was played for the jury. Then, after establishing a foundation, a second tape was played for the jury. Following the playing of the second tape recording, the prosecutor undertook to inquire of the witness who had participated in the conversation with Appellant (his former wife) "about things that were said on there, on page 2 of the transcript."

Appellant's attorney posed an objection that further inquiry would be repetitious and cumulative. He later posed the additional objection that to permit the inquiry would result in the witness giving her conclusions as to what was intended by the comment. The trial judge indicated his intention to sustain the objection.

Considerable discussion followed out of the hearing of the jury. The prosecutor indicated that he had agreed not to give transcripts to the jury but expressed concern that there was background noise on the second tape and represented the difficulty in hearing the transcript as one of the occasions when it is permissible to provide transcripts to the jury.

Further discussions established that portions of the tape recording were not audible. The prosecutor was told that he could either elicit testimony from the witness as to admissions made to her by Appellant or elect to play tape recordings of Appellant's statements but not first play tape recordings and thereafter inquire of the witness as to the meaning of the conversation. Following the trial court's sustaining objections to the prosecutor's further attempts to

inquire about the content of the tape recording, the court recessed. During that recess the court substantiated parts of the second recording (state's exhibit 47A) as being unintelligible and concluded that if that recording was to be meaningful to the jury, the jury would require some form of guidance.

The parties stipulated that an available transcript of the tape recording was accurate. The trial court then made the finding "... that 47A should be replayed to the jury, with a transcript in hand of each juror; that the next two tapes, 48A and 49A, require no transcript; 50A will also require a transcript in hand."

The parties stipulated as to the accuracy of the transcripts of the two tapes which were determined to be inaudible. The trial then resumed.

The jury was advised by the judge that the tape recording would be replayed and that the jurors would have transcripts for their aid. The trial judge further stated to the jury:

"THE COURT: The court is going to instruct you upon the law of having a transcript while listening to a piece of evidence. These transcripts are given to you to assist while listening to certain tape recordings which are evidence in this case. However the transcripts are not evidence or proof of any fact. If the transcripts do not correctly reflect the content of the tape recordings you should disregard them. In other words the transcripts are used only as a matter of convenience. So if—and to the extent that the transcript differs from what you hear on the tape recording, you are to disregard the transcript."

The second tape recording was then replayed to the jury with the jurors being provided copies of a transcript of the recording.

Thereafter, two additional tape recordings were played without utilizing transcripts and a fourth tape recording (state's exhibit 50A) was played with the jury being provided copies of its transcript.

Appellant asserts error was committed in the replaying of state's exhibit 47A and in the trial court providing the jury transcripts "on its own motion." Appellant contends the best evidence rule was violated, that the second playing of state's exhibit 47A was prejudicially cumulative and gave improper emphasis to statements on the tape. He further contends that the trial judge improperly intruded into the state's case.

Since the tape recording was admitted in evidence and played to the jury in addition to the transcript being provided for the jury's use, the best evidence rule was not violated. *State v. Brown*, supra at 885.

Appellant's complaint that the replay of state's exhibit 47A was cumulative is well taken. There is no question but that the prosecutor should have adequately reviewed state's exhibit 47A (as well as the other evidence intended to be offered) before trial so as to have determined whether that exhibit was inaudible. This would have permitted the issue of the use of transcripts due to inaudible tape recordings to have been properly addressed before state's exhibit 47A was played to the jury. The procedure which resulted, namely the playing of state's exhibit 47A and the subsequent determination that it was so inaudible as to warrant providing assistance to the jury by means of a transcript of its content, was error. It did result in undue repetition of the content of that tape recording and was cumulative. However, considering all the evidence presented and based upon careful review of the substance of the conversation contained on the recording, the procedure did not result in manifest injustice nor deprive Appellant of a fair trial.

Appellant's further complaints with respect to state's exhibits 47A and 50A pertain to the use of transcripts by the jury as aids in listening to those tape recordings. Those complaints are twofold. First, Appellant asserts that error occurred because the transcripts were provided "on the court's own motion" which constituted an

improper intrusion by the court into the state's case whereby the court "deviated from its role as an impartial arbiter of the case." Secondly, he asserts the circumstances of the case were such that the use of transcripts of the tape recordings which were admitted in evidence and played to the jury was improper.

 As previously stated regarding the remarks made by the trial judge after voir dire was completed, "... the court must always maintain an absolute impartiality in any trial, both in its remarks and in its conduct generally; ...." *State v. Sanders*, supra. The same applies to all the functions required of a judge in the conduct of a trial. However, this court has previously recognized that a trial judge has the duty in the conduct of a trial to see that the law is properly administered. *State v. Neal*, 476 S.W.2d 547, 550 (Mo. banc 1972). In performing this duty the trial judge should act with the purpose of maintaining orderly procedure and expediting the trial without denying the defendant any right to which he is entitled under the law. *Neal*, supra at 551.

In this case a tape recording (state's exhibit 47A) was properly admitted as evidence and played to the jury. Its quality, largely as a result of excessive background noise, was such that substantial parts were so inaudible as to prohibit its being understood. The prosecutor attempted to supply the lost meaning by questioning the person with whom Appellant conversed about the "meaning" of the conversation. After a series of objections to those questions, the trial judge advised the attorneys:

"THE COURT: ... I don't like to inject myself into how you choose to run your lawsuit but I am sincerely troubled by these tapes. I don't think that they—I don't believe that they are intelligible. At least not on the first playback."

Thereafter, the following observation was made:

"THE COURT: ... And I feel the jury is entitled to know what is contained on these transcripts. I don't think that any-

body knows having heard the tape one time. Therefore, I think that we are—it's worse than wasting time, I think we are simply torturing everybody with this device. And I would propose that if the state can qualify the transcripts, and I believe they can with witnesses available, that they ought to just submit that. And then the jury, exercising the wisdom of twelve people, can figure out what they say or do not say."

At a conference with the attorneys, the trial judge announced a finding that some form of guidance for the jury was required. Following the attorneys stipulating as to the accuracy of the transcripts, the trial judge further found that the jury needed the aid of transcripts with respect to the two tape recordings previously discussed.

The question presented therefore becomes whether the trial judge's actions merely constituted maintenance of orderly proceedings so as to expedite the trial or whether those actions denied Appellant rights which the law affords. If the trial judge's actions amounted only to technical supervision of the trial without denying the defendant a fair trial, there was no abuse of discretion by the trial court which would constitute reversable error. *State v. Cook*, 440 S.W.2d 461, 464 (Mo.1969).

 Although such obvious supervision of trial proceedings as occurred in this case is not suggested for future cases, under the unique circumstances of this case, we do not conclude that Appellant was denied the right to a fair trial. Reduced to its simplest form, the trial court assured that evidence produced by the state was presented in a manner which enabled a jury to understand its content. A trial judge has long been assured the right to propound questions to a witness for purposes of developing the truth more freely and clarifying testimony that has been given. *State v. Grant*, 394 S.W.2d 285, 287 (Mo.1965). That procedure, though perhaps not as fraught with danger as the conduct which the trial judge undertook in this case, accomplishes the same result as occurred at Appellant's trial; namely, aiding the jury's ability to perceive the evidence produced. The fact that the

**480**

trial judge concluded the need existed for transcripts of inaudible tape recordings did not constitute an abuse of discretion which deprived Appellant of a fair trial. That involvement by the trial judge did not demonstrate prejudicial error.

The procedure followed by the trial judge in utilizing the transcripts of the two inaudible tapes was consistent with those guidelines established by *United States v. McMillan*, 508 F.2d 101, 106 (8th Cir. 1974). That procedure was previously suggested as appropriate in *State v. Montgomery*, 590 S.W.2d 105, 108 (Mo.App.1977).

Appellant's final assignment of error regarding the tape recordings played to the jury pertains to the use of edited portions of more lengthy conversations. At trial, having previously known the state would offer recordings of only portions of conversations between Appellant and his former wife, Appellant's counsel objected to not playing the entire recorded conversations. He requested that the prosecutor be required to play the entire recorded conversations. That request was denied.

Appellant contends that once the state sought to use a part of its lengthy recordings, it could not object to defendant's request that the entire conversations be played because defendant was entitled for the jury to hear the deleted portions of the recordings that tend to explain, contradict or qualify those parts of the conversations the state wished to use. As authority for that proposition, Appellant cites *State v. Odom*, 353 S.W.2d 708, 711 (Mo.1962); *State v. Dancy*, 541 S.W.2d 35, 37 (Mo.App.1976); and, *State v. Hodges*, 575 S.W.2d 769, 774 (Mo.App.1978).

The principle asserted by Appellant is correct. However, Appellant's attempted application of that principle to the facts of this case is faulty.

■ This case deals with recorded conversations to which Appellant was a party. Those recordings are admissable as an exception to the hearsay rule because they constitute admissions of Appellant. *State v. Spica*, supra at 46. To be substantive

evidence an admission not only must be the statement of an opposing party but must be relevant to a material issue in the case in which it is offered.

■ Appellant has failed to show that the deleted portions of the recorded conversations were relevant to any material fact. He has further failed to show that any of those parts tend to explain, contradict or qualify the excerpts which were placed in evidence by the state and played to the jury. Furthermore, Appellant simply posed an objection to the use by the state of only parts of the conversations rather than their use in their entirety. He did not offer other parts for purposes of cross examination nor as part of his defense in order to explain, contradict or qualify the parts used by the state.

No error was committed in denying Appellant's broad request for the entire series of recordings (which consisted of five hours of recorded conversations) to be played to the jury.

## V

### Alibi Instruction

■ Appellant raises as a claim of error the trial court's failure to give an alibi instruction. Appellant tendered an instruction in the form of MAI–CR 3.20. The instruction was refused, labeled Instruction A, and filed but not read nor given to the jury.

Appellant asserts that MAI–CR 2d requires the giving of the alibi instruction when it is requested by a defendant. He contends that evidence at trial showed the time of the incident which resulted in the victim's death at about 5:00 p. m. on January 14, 1980, and that Appellant produced evidence that he was at a location other than where the victim was killed from 1:00 p. m. to 7:00 p. m. on that date. Appellant thereby asserts that the evidence supports the giving of the alibi instruction.

Rule 28.02(a) requires a trial court to "... instruct the jury upon all questions of law necessary for its guidance in returning a verdict."

The evidence adduced was that the victim died as a result of a bomb exploding when she started her automobile engine and proceeded to move the automobile. The state's theory, which was supported by competent evidence, was that the bomb was constructed so as to detonate when the automobile was started, placed in gear and rolled forward. Under those facts, whether or not Appellant was present when the explosion occurred was not a determinative issue of his guilt. The alibi instruction was not supported by the evidence and was, therefore, unnecessary as guidance for the jury in returning a verdict.

Under these facts, the absence of Appellant from the scene at the time the victim was killed was immaterial.[3] *State v. Newberry*, 605 S.W.2d 117, 121 (Mo.1980). The trial court properly refused the alibi instruction.

Judgment affirmed.

MORGAN, P. J., BARDGETT and RENDLEN, JJ., and SEAY, Special Judge, concur.

---

3. Compare *State v. Slay*, 406 S.W.2d 575 at 579 (Mo.1968). Although an alibi instruction was required in that case, this court recognized that circumstances might exist whereby a defendant could be guilty of a crime even though his presence was unnecessary at the time of the actual event which completed the criminal act.